[629 NYS2d 395]

In the Matter of RONALD CRUMPLEY, Respondent-Appellant, v RENATE WACK, as Director of Kirby Forensic Psychiatric Center, Appellant-Respondent, and ROBERT M. MORGEN-THAU, as New York County District Attorney, Appellant.

In the Matter of RICHARD G. SURLES, as State Commissioner of Mental Health, Appellant-Respondent, v RONALD CRUMP-LEY, Respondent-Appellant.

First Department, June 20, 1995

## APPEARANCES OF COUNSEL

*Stephen J. Harkavy* of counsel, New York City *(Marvin Bernstein, Mental Hygiene Legal Service,* attorney), for respondent-appellant.

*Edward J. Curtis, Jr.,* of counsel, New York City *(Dennis C. Vacco, Attorney-General,* attorney), for appellants-respondents.

*Morrie I. Kleinbart* of counsel, New York City *(Mark Dwyer* and *Gary J. Galperin* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), appellant *pro se.*

## OPINION OF THE COURT

Per Curiam.

On these consolidated appeals the ultimate question pre-

sented for this Court's determination is whether defendant is entitled to a release order pursuant to CPL 330.20. Such an order would direct the New York State Commissioner of Mental Health (the Commissioner) to terminate defendant's continued in-patient status, without terminating the Commissioner's responsibility for defendant (CPL 330.20 [1] [m]). We conclude the question must be answered in the negative.

In 1981 defendant successfully interposed an insanity defense and was acquitted of multiple crimes, including the killing of two men and wounding of six others because he believed they were gay and trying to corrupt his soul. He has spent the past 14 years principally placed in secure facilities pursuant to a series of retention orders. The relevant statute, CPL 330.20, provides for the issuance of a subsequent retention order when it has been established "to the satisfaction of the court that the defendant has a dangerous mental disorder *or* is mentally ill" (CPL 330.20 [9] [emphasis added]). It appears that in the proceedings had prior to those from which these consolidated appeals ensued, defendant was consistently found to have a "dangerous mental disorder." This means he suffered from a "mental illness" as defined in Mental Hygiene Law § 1.03 (20) *and* that as a result of said illness he constituted a physical danger to either himself *or others* (CPL 330.20 [1] [c]).*

On August 25, 1993, Supreme Court (Edith Miller, J.), after a hearing, found that defendant continued to suffer from a dangerous mental disorder, and issued yet another retention order, with an expiration date of March 11, 1994. Dissatisfied with the retention order, defendant timely exercised his right under the statute to apply for a jury rehearing and review of

---

* CPL 330.20 (1) (c) provides: " 'Dangerous mental disorder' means: (i) that a defendant currently suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a danger to himself or others."

Mental Hygiene Law § 1.03 (20) provides: " 'Mental illness' means an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation."

CPL 330.20 (1) (d) separately defines "mentally ill" to mean "that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant's welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment".

Justice Miller's retention order (CPL 330.20 [16]). As of January 12, 1994, for reasons partly attributable to defendant's delay in motion practice, the jury rehearing and review had not yet commenced. With the expiration date of the August 25, 1993 retention order rapidly approaching, the Commissioner timely applied for a subsequent retention order pursuant to CPL 330.20 (9). While the hearing on the application for a new retention order was pending, the August 25, 1993 retention order expired, leading the People, on April 5, 1994, to move to dismiss defendant's petition for a jury rehearing and review on that basis.

By decision and order dated April 26, 1994, Supreme Court (Kristin Booth Glen, J.) denied the motion to dismiss and directed the jury rehearing and review of the expired retention order to proceed. The People filed a notice of appeal and, although they were denied a stay of the jury rehearing and review, they were ultimately granted leave to appeal from Supreme Court's order denying their motion to dismiss as part of these consolidated appeals.

On July 1, 1994, the parties stipulated that the jury rehearing and review ordered to take place by Justice Glen with respect to Justice Miller's August 25, 1993 retention order would be tried at the same time as the bench trial on the January 12, 1994 application for a subsequent retention order. The jury rehearing on the expired retention order and the nonjury hearing on the application for a new retention order were conducted simultaneously in July 1994, before Justice Martin Evans.

At the conclusion of this hybrid proceeding, based on what the People claim were erroneous jury instructions, the jury returned a verdict, which found that defendant currently has a "mental disease, needs hospitalization, is potentially dangerous if released," but is not "mentally ill" as defined in CPL 330.20 (1) (d). Supreme Court (Martin Evans, J.) then entered three orders, which according to the parties' characterization, granted the People a judgment notwithstanding the verdict. The hearing court also ordered defendant's continued retention in the custody of the Commissioner, while directing that defendant be transferred to a nonsecure facility. The Commissioner, the People, and the Director of Kirby Forensic Psychiatric Center, the secure facility where defendant is now placed, appeal from these orders to the extent that they direct defendant's transfer to Manhattan Psychiatric Center, a nonsecure facility. Defendant cross-appeals to the extent that

the Supreme Court's orders effectively granted the People a judgment notwithstanding the verdict. He also seeks a "release order" and an "order of conditions" (CPL 330.20 [9]) based on the jury's determination that he was not "mentally ill."

■ It is well settled that courts will only consider a justiciable controversy, as distinguished from a hypothetical difference or dispute or one which has been rendered academic or moot (Aetna Life Ins. Co. v Haworth, 300 US 227, 239; Matter of Hearst Corp. v Clyne, 50 NY2d 707, 713). An action is moot if a determination by the court will not, as an " 'immediate consequence of the judgment' " sought, affect the rights or interest of the parties (Matter of Sherry Lehmann v New York State Liq. Auth., 160 AD2d 538, 539).

As the motion court acknowledged, the plain language of the statutory scheme links the right to a jury rehearing and review to the existence of a valid retention order. Here, at the time of the July 1994 jury rehearing and review, the challenged August 25, 1993 retention order had expired and a hearing had yet to be held with respect to the pending application for a superseding retention order. Nevertheless, the motion court held that to withstand constitutional challenge, the statutory scheme must be read as implicitly containing a broad-based exception to the mootness doctrine for all cases of this kind. However, the court's reasoning was premised on sheer speculation as to the likelihood of review in these kinds of matters, and out of concern that, without such an exception being created, the People could routinely thwart a defendant's right to obtain a jury review of a retention order by initiating an application for a subsequent retention order. While the motion court never made any findings about the degree and cause of the delay in this case, or in similar cases, we note that it appears that a substantial portion of the delay here was attributable to defendant's tardiness in motion practice. Certainly, it cannot be said that, on this record, defendant presented adequate proof to meet the standard required to invoke an exception to the mootness doctrine enunciated in Matter of Hearst Corp. v Clyne (supra). Nor has he adequately demonstrated the need to create an entirely new standard for an exception to the doctrine in this particular category of cases.

Matter of Coates (9 NY2d 242, appeal dismissed sub nom. Coates v Walters, 368 US 34) does not mandate a contrary result. That case, which did not arise in the context of an

acquittal of a crime by reason of mental disease or defect, concerned the notice requirements for a determination on the permanent status of a mentally ill person in a civil commitment. Indeed, it has been held in the context of appeals that when the issue concerns whether a defendant has a "dangerous mental disorder" and there has been a more recent determination, an appeal from the prior order is moot *(Matter of Cruz,* 105 AD2d 617). In *Matter of David C.* (69 NY2d 796, 798), the Court of Appeals declined to adopt a rule that because all retention proceedings are short-lived they "should be subject to review irrespective of mootness." We are presented with no compelling rationale which persuades us that the rule for a jury rehearing and review of a retention order should be different from that which controls review on appeal. Here, once the August 25, 1993 order had lost its legal effect, the request for jury rehearing and review became academic and the motion to dismiss should have been granted. Accordingly, the jury rehearing and review in this case was a nullity and the jury verdict should be vacated.

■ The only issue, then, which was properly before the Supreme Court at the time of the July 1994 hybrid proceeding, was whether a subsequent retention order should issue pursuant to the January 12, 1994 application. The orders ultimately signed by Justice Evans necessarily imply that the hearing court found that defendant would be a danger to himself or others if directly released, but that he would not constitute such a danger if maintained in a hospital setting, even if the facility be nonsecure. The orders directed a retention of defendant coupled with a transfer of him from a secure to a nonsecure facility and appear to have been an attempt to harmonize the jury verdict with the evidence. That verdict, if left undisturbed by the hearing court, would have entitled defendant to a release order, notwithstanding the fact that the evidence of defendant's continued mental illness and dangerousness was overwhelming. It appears that in so doing, nisi prius applied a definition of current dangerousness similar to a standard which has since been rejected by both this Court *(Matter of Francis S.,* 206 AD2d 4, *lv granted* 212 AD2d 1071) and the Court of Appeals *(Matter of George L.,* 85 NY2d 295). To the extent that the hearing court failed to consider and assess defendant's potential danger to others in the future, it erred. The Court of Appeals has now made clear that the analysis called for by the statutory scheme "necessarily involves an assessment of a defendant's future dangerousness"

*(Matter of George L., supra,* at 303). As the Court explained, the use of the term "currently" in clause (ii) of subdivision (1) (c) does not confine the court's consideration of the defendant's dangerousness to the precise moment of any given CPL 330.20 hearing *(Matter of George L., supra,* at 304; *Matter of Francis S., supra).*

On the issue of whether a retention order should issue, at the July 1994 hearing, the parties seeking to retain defendant in a secure facility presented four witnesses: Dr. Anthony Lanotte, defendant's ward psychiatrist since September 1993, and Dr. Eric Goldsmith, the clinical director of Kirby Forensic Psychiatric Center (Kirby), were both called by the Commissioner; and Ms. Dawn Grant and Mr. Anthony Rouse, two senior security hospital treatment assistants who had worked on defendant's ward, were called by the District Attorney. Defendant presented three witnesses: Dr. Jacques Quen, appointed from this Court's list of independent psychiatric experts; Dr. John Jannes, a psychologist who had previously worked at Kirby, and defendant. We note that in reviewing this evidence, as in our review of any nonjury determination, this Court has the power to make its own findings of fact rather than ordering a new trial *(Cohen v Hallmark Cards,* 45 NY2d 493, 498). We now make those findings.

Although, as a result of his extended hospitalization, defendant is less overtly vituperative in what he says about gay men and, therefore, appears to be less patently irrational, his record is nonetheless punctuated with incidents, conduct, and statements which, in our view, can only lead to one conclusion —defendant currently suffers from a mental illness and, while arguably not presenting a danger to himself, he would clearly constitute a danger to others if released. We find by a "fair preponderance of the credible evidence" *(People v Escobar,* 61 NY2d 431, 435) that it has been established that the dangerous mental disorder which caused defendant to engage in the 1980 unprovoked shooting rampage targeted at gay men persists.

Defendant committed a series of crimes in the 1970's to support his polysubstance abuse, but it was not until 1978 or 1979 that he began to believe that gay men were agents of the devil, "conspiring to get him," in an effort to steal his soul and alter his character, and thus "make him a homosexual." Around this time defendant began assaulting people with his hands if he believed they were gay and following him. By November 1980, defendant's mental illness had progressed to

a point where he engaged in a crime spree which ultimately left two men dead, and six others wounded.

Two days before the November 19, 1980 shootings, defendant called his father, a minister, to seek advice because defendant believed he was being pursued by hundreds of gay men. According to defendant, his father told him it was all in his mind, and suggested that perhaps "he had a homosexual problem himself." The next day defendant went to his father's home in Westchester, stole his father's car, and initially tried to make his father accompany him. Defendant then drove to his sister's home in Virginia.

The next morning, defendant, a former New York City transit police officer and Air Force veteran, robbed a Virginia gun store, taking a .357 magnum revolver, a Beretta semiautomatic pistol, a Browning High Power semiautomatic pistol, and the Uzi automatic pistol he would later use against gay men. Defendant, then set out to leave Virginia, but stopped to rob a bank along the way because, to him, the fact that a woman was standing outside it without a coat in November indicated that "they want[ed] me to rob the bank." After making a detour to drive a male hitchhiker back to the town where he robbed the bank, defendant returned to New York City.

After stopping at his wife's apartment, defendant drove to the west part of Greenwich Village, where he found himself on Washington Street. Defendant saw some people who appeared to be gay, so he took out a gun and began to shoot at them. After shooting at, but missing, two strangers in the street (the men escaped injury by ducking behind parked cars, and not, as defendant then believed, by disappearing magically into the air), defendant recognized a building he knew to be a gay bar. Defendant drew the Uzi and attacked the bar patrons who were at the entrance because, as he subsequently explained, "I felt that they were of the flesh and I was spiritual, and they were trying to kill my spirit, so I had to kill their flesh; and I felt that I was at a war with them and that I had won the war, and I was a martyr". Unfortunately, this time defendant did not miss; two men were killed and six others wounded.

At his trial the following summer, defendant successfully interposed an "insanity" defense and he has since been retained in the custody of the Commissioner. By the time of the July 1994 hearing, according to Dr. Lanotte, defendant had

improved to the extent that his delusions about gay men may have lost their "magical" and "mystical" quality in that he now denies that "homosexuals can control his mind," or can "in some way * * * make him a homosexual," but defendant continues to believe "to this day that he was targeted * * * in the street by homosexual men." Indeed, Dr. Lanotte testified that defendant reiterated his belief that he was, is, and would be the subject of unwanted sexual advances from other men as recently as the day before Dr. Lanotte's testimony at the July 1994 hybrid proceeding. Defendant himself admitted on the stand that he still believed that gay men posed a threat to his safety, and that, if released, he would possibly have to obtain a firearm to defend himself.

While we do not summarize each and every incident, statement or portion of the expert testimony which lends support to our findings, we note in particular the testimony of Dr. Goldsmith and Dr. Lanotte that defendant is currently suffering from a mental illness. Both psychiatrists had a role in the treatment of defendant at Kirby at the time of the hearing and concurred that on the first axis used in making psychiatric diagnoses, defendant suffered from delusional disorder, persecutory type, with a history of polysubstance abuse and alcohol dependency. With regard to the axis two personality disorders, Dr. Lanotte diagnosed the defendant as having a mixed personality disorder with antisocial traits, paranoid traits, and narcissistic traits. Dr. Goldsmith diagnosed the defendant as suffering from a paranoid personality disorder and a narcissistic personality disorder, and added that the defendant exhibited antisocial features of a personality disorder. It suffices to say, that both doctors concurred that defendant is an individual who suffers from mental illness, and who has limited insight into the role his mental illness played in his committing the unprovoked shootings and other crimes, as well as the role it continues to play in his difficulties with hospital staff.

We also credit Dr. Lanotte's testimony that defendant's efforts to control his mental illness through psychotherapy from 1983 to 1990 failed. Both psychiatrists, Lanotte and Goldsmith, believe that defendant would be helped by medication, but defendant has consistently exercised his legal right to refuse medication. At this point, defendant believes he is only being retained in the hospital because of outside political pressure from the lesbian and gay community.

Finally, we specifically credit the expert testimony of Dr.

Lanotte that defendant would likely decompensate in a nonsecure facility and become dangerous to others, as well as the portion of the testimony of Dr. Quen, the court-appointed independent expert, wherein he acknowledged that it would be inconsistent with the welfare of the defendant and the community to discharge defendant. We reject the conclusion of defendant's witness, psychologist Dr. Jannes, who treated defendant from 1986 to August 12, 1993, to the extent that he concluded that defendant could be successfully treated as an outpatient.

Upon our independent review of the record, we find that the defendant continues to suffer from a dangerous mental disorder (CPL 330.20 [1] [c]), particularly when the evidence is considered in light of the standards enunciated in *Matter of Francis S. (supra)* and *Matter of George L. (supra)*, and that he should be retained in a secure facility.

Accordingly, the order of the Supreme Court, New York County (Kristin Booth Glen, J.), entered on or about April 26, 1994, should be unanimously reversed on the law, without costs, and the application for a jury rehearing and review dismissed. The retention and transfer orders of the Supreme Court, New York County (Martin Evans, J.), entered on or about August 5, 1994, should be unanimously modified, on the law and the facts, to the extent of vacating the jury verdict as a nullity, deleting the direction that defendant be transferred to Manhattan Psychiatric Center, a nonsecure facility, for a period not to exceed one year, and the orders amended to reflect a finding that defendant currently suffers from a dangerous mental disorder and to direct that defendant be retained in Kirby Forensic Psychiatric Center, a secure facility, for a period not to exceed one year, without costs.

SULLIVAN, J. P., ELLERIN, WALLACH, KUPFERMAN and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered on or about April 26, 1994, reversed, on the law, without costs, and the application for a jury rehearing and review dismissed. Orders, Supreme Court, New York County, entered on or about August 5, 1994, modified, on the law and the facts, to the extent of vacating the jury verdict as a nullity, deleting the direction that defendant be transferred to Manhattan Psychiatric Center, a nonsecure facility, for a period not to

exceed one year, and the orders amended to reflect a finding that defendant currently suffers from a dangerous mental disorder and to direct that defendant be retained in Kirby Forensic Psychiatric Center, a secure facility, for a period not to exceed one year, without costs.