*298
 
 OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This case presents the difficult question whether a mentally ill individual — found to be not responsible, by reason of mental disease or defect, of committing a violent crime— "currently constitutes a physical danger to himself or others” (CPL 330.20 [1] [c]) so as to remain confined in a secure psychiatric hospital even though his symptoms have improved considerably. We agree with both the trial court and the Appellate Division that, in this case, the People sustained their statutory burden of showing current dangerousness.
 

 I.
 

 On June 28, 1990, appellant was released from the psychiatric unit at St. Francis Hospital in Dutchess County where he had been admitted two weeks earlier, after assaulting his father. Although the doctors at St. Francis apparently misdiagnosed appellant as suffering from bipolar disorder — a less serious illness than the acute paranoid schizophrenia from which he actually suffers — while at St. Francis, appellant received neuroleptic medication, a treatment also suitable for schizophrenics.
 

 The hospital records indicate that appellant was released from St. Francis based on the doctors’ opinion that because he had become "medication compliant” and had gained greater insight into his illness, he would continue treatment at an outpatient clinic, continue taking his medication, and abstain from alcohol and marihuana (which exacerbated his violent and delusional behavior).
 

 
 *299
 
 On July 8, however, only 10 days after his release from St. Francis, believing that he was the Messiah, that the world was about to end, and that he had a God-like mission to struggle against evil, appellant again attacked his father, this time with a hunting knife, seriously wounding him. In speaking about the incident some time later, appellant explained that because he believed at the time that he could break the law and get away with it, he had decided to destroy his former employer who represented evil, but unable to locate his employer he turned on his father instead. Appellant also later admitted that he had visited the outpatient clinic recommended by the doctors at St. Francis only once because he was unwilling to continue taking his medication.
 

 As a result of the assault on his father and reckless driving of his pick-up truck several hours afterwards, appellant was taken into custody and indicted in County Court on separate counts of attempted murder, assault and reckless endangerment. On August 15, 1990, after receiving the recommendation of two independent psychiatrists, the trial court found appellant unfit to proceed and ordered him temporarily committed to the custody of the Commissioner of Mental Hygiene (CPL art 730). Appellant was transferred to the Mid-Hudson Psychiatric Center.
 

 Four months later, after being discharged from Mid-Hudson because his delusional thinking had abated, appellant was again examined to determine his fitness to proceed. Though acknowledging that the symptoms seemed to have improved, the examining psychiatrist reported that appellant was still subject to delusions:
 

 "His insight and judgment are questionable * * * [T]he defendant’s mental status has not been consistent, even recently, and that he was talking about auditory hallucinations, and God, telling him to do things to other people, specifically in regards to an incident with his father. * * * [Although] the defendant attempted to present himself from a good light * * * his mental status is fragile and susceptible to rapid, acute, unpredictable decompensation.”
 

 Appellant’s psychiatrists later acknowledged that during this period he had suffered a relapse in jail, while on medication. As a result of the court’s finding that he was still unable to
 
 *300
 
 assist his attorneys, appellant was returned to Mid-Hudson in January 1991.
 
 [1]
 

 After his subsequent discharge from Mid-Hudson to the custody of the Department of Correction, three months later, in April, the trial court concluded that appellant was fit to proceed. On June 11, 1991, appellant offered a plea of not responsible by reason of mental disease or defect.
 

 Three psychiatrists then examined appellant and submitted reports to assist the trial court in the statutory determination whether he "currently” suffered from a mental illness and whether he constituted a physical danger to himself or others (CPL 330.20 [1] [c]). Although all three psychiatrists agreed that appellant was mentally ill, suffering from "schizophrenia, paranoid type, chronic with acute exacerbation,” two of the three concluded that because the illness was in remission as a result of the therapy he had been receiving at Mid-Hudson (including treatment with the antipsychotic medications loxitane, cogentin and vistaril), appellant could safely be treated in a nonsecure facility. Even the psychiatrist who subsequently testified on appellant’s behalf, however, acknowledged that "[t]his 24 year-old male has at least a two year history of delusional thinking, resulting in dangerous behavior”.
 

 While not disagreeing with his colleagues that appellant’s schizophrenia was in remission and that appellant was not dangerous as long as he continued taking medication, the prognosis of the People’s witness, Dr. Bucove, was considerably less sanguine. As he concluded in his written report to the trial court:
 

 "There is no evidence that schizophrenia can be cured. From a statistical point of view, [appellant] is more likely to relapse than not relapse over time * * * If [appellant] lived in the community, there would be a danger to the community of his relapsing to an active state of schizophrenia with a recurrence of homicidal intentions * * * [Appellant] was treated at the psychiatric unit of St. Francis hospital from June 14th through June
 
 *301
 
 28th, 1990. He stabbed his father on July 8, 1990. * * * If [appellant] is transferred to a non-secure facility, his family * * * should be advised of the risks to them * * * Given the unreliability of predicting dangerousness, the court has a difficult role in making a decision regarding his disposition”.
 

 Similarly, at the evidentiary hearing on January 2, 1992, Dr. Bucove testified:
 

 "As a physician, I can’t speak of a course of specific persons, specific course of illness in the future. I could only speak of in terms of what happens with these people with his illness. It is a fact with people with his illness frequently do decompensate without * * * forewarning * * * The problem with schizophrenia is that one is vulnerable to recurrence and the recurrence of schizophrenia usually takes the same pattern as previous relapses. * * * I would say there is a high probability of a relapse over time.”
 

 Based on the evidence, the Trial Judge found that appellant did in fact pose a current danger and should remain confined to a secure facility:
 

 "[T]he People have sustained their burden of demonstrating that the petitioner suffers from a dangerous mental disorder * * * Although there is medical testimony to the effect that at the time of examination petitioner was not specifically dangerous, * * * there is a danger of relapse at any time. In view of the short time between the commission of the acts which led to the indictment and this application, there is an insufficient basis upon which to make a determination as to petitioner’s long-term stability for purposes of transfer to a non-secure facility.”
 

 Thus, having been retained either in a psychiatric hospital or in prison for the 17 months since attacking his father, appellant was ordered confined to a secure psychiatric facility as a "track 1” defendant suffering from a dangerous mental disorder thus subject to greater restrictions regarding his future transfer, furlough or release
 
 (People v Stone,
 
 73 NY2d 296, 300;
 
 Matter of Jill ZZ.,
 
 83 NY2d 133, 137).
 

 
 *302
 
 After affirmance by the Appellate Division, this Court granted leave to appeal.
 
 [2]
 

 II.
 

 In determining whether appellant was correctly found to suffer from a "dangerous mental disorder,” we begin with the governing statute:
 

 " 'Dangerous mental disorder’ means: (i) that a defendant currently suffers from a 'mental illness’ as that term is defined in * * * the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others.” (CPL 330.20 [1] [c].)
 

 As appellant concedes, this case is not about whether he suffers from a mental illness: each psychiatrist to have examined him since his arrest agrees that he suffers from acute paranoid schizophrenia. Rather, the sole question presented is whether, on account of that condition, in January 1992 he "currently constitute^] a physical danger to himself or others” and should therefore be committed to a secure psychiatric facility.
 

 We are thus presented with the question of defining the word "currently” as used in CPL 330.20 (1) (c) (ii), an issue we have yet to address in any detail.
 

 Relying on
 
 Matter of Torres (People)
 
 (78 NY2d 1085,
 
 affg for reasons stated in
 
 166 AD2d 228), appellant makes essentially two arguments why the People’s evidence was insufficient to establish his dangerousness as of January 1992. First, he contends that "currently” must be read in its strictest sense, and that in January 1992 (when he was taking antipsychotic medication in the controlled environment of a psychiatric hospital), his disease was in remission.
 

 Second, appellant points to the People’s failure to offer evidence of violent acts in the 17 months between the attack
 
 *303
 
 on his father and his commitment proceeding. Without such evidence, he reasons, the People’s case improperly depended upon the nature of his criminal act combined with the statistical probability of relapse affecting paranoid schizophrenics generally, rather than a particularized showing that he would again degenerate into violent and delusional behavior.
 

 We conclude, however, that the evidence here amply supported the trial court’s holding, by a preponderance of the evidence
 
 (People v Escobar,
 
 61 NY2d 431), that appellant posed a danger to himself and others at the time of his commitment hearing even though he had been relatively complacent while confined in various psychiatric and correctional facilities during the period since his arrest. We now address each of appellant’s arguments on this appeal.
 

 III.
 

 In construing the word "currently” in the context of the statute, we start from the proposition that the Legislature could not have intended that the word be read in its strictest sense, as individuals under the supervision of the Department of Correction or the Department of Mental Health during the course of CPL 330.20 proceedings ordinarily pose little
 
 current
 
 risk to themselves or to others. This reading of the statute is reinforced by the legislative purpose behind the court’s inquiry — to determine whether an insanity acquittee should be placed in a secure facility as a "track 1” defendant, a nonsecure facility as a "track 2” defendant, or released into the general population as a "track 3” defendant.
 
 (Stone, supra; Jill ZZ., supra.)
 

 Thus, "[w]hile it is true that * * * a person suffering from mental disease or defect * * * ought not to be held criminally responsible for that conduct and subjected to traditional punishment * * * the legislatively mandated consequences of a successful imposition of the defense equally reflect society’s legitimate interest in knowing whether the defendant is
 
 and will continue to be
 
 a threat to himself or others”
 
 (People v Lancaster,
 
 69 NY2d 20, 27 [emphasis added]). Such an analysis necessarily involves an assessment of a defendant’s future dangerousness.
 

 In arguing that the word "currently” should be interpreted strictly, appellant cites to the Appellate Division’s writing in
 
 Torres,
 
 where the court, in affirming a trial court’s conclusion that a paranoid schizophrenic acquitted by reason of insanity
 
 *304
 
 of second degree murder was not dangerous, seems to have suggested that judgments about a defendant’s dangerousness can only be made as of the moment of the CPL 330.20 hearing:
 

 "The main proof offered [by the People] was [a psychiatric] opinion * * * that defendant was mentally ill and that should he discontinue his medication he may attempt to escape. * * * [This] opinion does not establish that defendant
 
 currently
 
 poses a danger, but would pose such a threat only in the event that he discontinue his medication in the future * * * Here, the evidence at the hearing showed that so long as defendant takes his medication, he is no longer psychotic or dangerous as he was at the time of the original incident.”
 
 (Id.,
 
 at 230-231 [emphasis in original].)
 

 To the extent that
 
 Torres
 
 might be read to indicate that the only relevant question pursuant to CPL 330.20 is whether a defendant, who has achieved "synthetic sanity”
 
 (State v Perez,
 
 563 So 2d 841, 844 [La]) by virtue of receiving psychotropic medication, is dangerous as of the moment he is sitting in the courtroom, that interpretation is contrary both to common sense and to substantial justice. Indeed, appellant’s argument would lead to the absurd conclusion that a defendant in a straightjacket, surrounded by armed guards, is not currently dangerous under the statute. As the Supreme Court of Kansas reasoned in similar circumstances:
 

 "Let us suppose a court is called upon to determine whether a shipment of nitroglycerine can be stored in the center of a large city. The experts testify that nitroglycerine is not dangerous as long as it is stored at temperatures below 180 degrees Fahrenheit and is not jiggled. No evidence is admitted as to the conditions under which the nitroglycerine is proposed to be kept, or supervision thereof. It would obviously be error for the court to conclude the explosive presented no risk as long as its needs were met, and to delegate determination of proper conditions to others.”
 
 (Matter of Noel,
 
 226 Kan 536, 555, 601 P2d 1152, 1167.)
 

 Indeed, the First Department itself recently made clear that its opinion in
 
 Torres
 
 should not be so read:
 

 
 *305
 
 "Both doctors acknowledged that S. exhibited no symptoms of dangerous mental disorder and was not psychotic
 
 when he was in a psychiatric institution.
 
 They both testified, however, that this was not unusual since an individual committed against his will would be given medication and forced to comply with a treatment plan. Moreover, an individual such as S. would try to be on good behavior to ensure his release. In short, compliance or lack of dangerousness in a facility does not necessarily mean that an individual does not suffer from a dangerous mental disorder.”
 
 (Matter of Francis S.,
 
 206 AD2d 4, 13 [1994] [emphasis in original].)
 

 We thus conclude that CPL 330.20 — which affects only those who have been found to be not responsible of a crime by reason of mental disease or defect — does not constrain a court to determining dangerousness as of the moment in time that a defendant is before it after a verdict or plea of not responsible by reason of mental disease or defect.
 
 [3]
 

 IV.
 

 In rejecting the notion that there was insufficient evidence that appellant posed a current danger, we begin with the basic proposition that because the trier of fact is in the best position to observe the individual’s behavior as well as evaluate the weight and credibility of the often conflicting testimony of the medical and psychiatric experts, we accord deference to a trial court’s CPL 330.20 determination that an insanity acquittee suffers from a dangerous mental disorder
 
 (see, Mental Hygiene Legal Servs. v Wack,
 
 75 NY2d 751;
 
 Torres, supra).
 

 Again, appellant reads our precedents too expansively in arguing that a court may not consider the nature of the defendant’s criminal act in making a determination of dangerousness. Although the
 
 Torres
 
 court
 
 (supra,
 
 at 231), citing our earlier decision in
 
 Matter of Torsney
 
 (47 NY2d 667), held that "the nature of the prior criminal act for which the detainee was acquitted is insufficient, without more, to demonstrate a
 
 *306
 

 current
 
 danger which would preclude his release or transfer,” this does not mean that a court is precluded from considering the nature and recency of the criminal act in deciding whether a defendant remains dangerous at the time of his commitment. As the plurality in
 
 Torsney
 
 explained, because "persons acquitted of a crime by reason of mental disease or defect * * * have demonstrated past antisocial behavior, the State is permitted to engage in what may be broadly termed a presumption that the causative mental illness or defect continues beyond the date of the criminal conduct” (47 NY2d, at 673-674;
 
 see also People ex rel. Henig v Commissioner of Mental Hygiene,
 
 43 NY2d 334, 338).
 

 Indeed, this presumption, which is really a presumption that the mental illness found to have
 
 caused
 
 the defendant’s dangerousness continues after the commission of the crime, is even stronger in cases like the one before us where the defendant’s "antisocial behavior” constituted a crime of violence. As one commentator observed:
 

 "The recent commission of a violent act significantly increases the probability that an individual will commit further such acts in the future. This judgment is not simply a popular notion; the clinical consensus is that a history of violent behavior in an individual is the single best predictor of future violence [and] is supported by studies of insanity acquittees, which indicate a recidivism rate equal to that of prison populations.” (Note,
 
 Rules for an Exceptional Class: The Commitment and Release of Persons Acquitted of Violent Offenses by Reason of Insanity,
 
 57 NYU L Rev 281, 295-296 [1982].)
 

 Though there was little evidence that appellant had committed acts of violence after his arrest while in jail or at Mid-Hudson, the trial court was justified in considering, as it did, that appellant’s attack on his father had occurred only 17 months prior to the commitment proceeding.
 
 [4]
 
 Appellant’s own psychiatric witness acknowledged on cross-examination that it was possible for a person with the appellant’s diagnosis who
 
 *307
 
 has acted violently in the past to relapse into such behavior without prior warning.
 

 Appellant’s attempt to murder his father with a hunting knife was not so remote in time as to be devoid of evidentiary value. Furthermore, the lack of evidence that he had engaged in more recent violent acts must be viewed in light of the fact that he was in custody for the entire 17 months prior to his commitment hearing. It obviously would have been difficult for appellant to attack his father or anyone else while essentially tranquilized on three different psychotropic medications as a patient at Mid-Hudson
 
 (Warren v Harvey,
 
 632 F2d 925). We thus conclude that appellant’s plea of not responsible by reason of mental disease or defect for the crime of attempted murder, though hardly dispositive proof of his dangerousness, was certainly evidence that he remained a danger to society.
 

 We are similarly unpersuaded by appellant’s argument that the court could not rely on the statistical evidence that because it is “highly likely” that the general population of paranoid schizophrenics who have previously exhibited violent and delusional behavior will do so again, appellant was highly susceptible to relapse. It is clear that the trial court was impressed with the candor with which the People’s psychiatrist, Dr. Bucove, acknowledged the inability of modern psychiatry to accurately predict future dangerousness with respect to a specific individual. As the Law Revision Commission which proposed the legislation substantially incorporated in the current version of CPL 330.20 recognized
 
 (see,
 
 Insanity Defense Reform Act of 1980, L 1980, ch 548), “psychiatry cannot now guarantee the safety of the public from future dangerous acts of persons found not responsible * * * and will most likely be unable to do so in the foreseeable future” (1981 Report of NY Law Rev Commn, 1981 McKinney’s Session Laws of NY, at 2261).
 
 [5]
 

 Of course, a finding that a defendant "currently constitutes a physical danger to himself or others” must be based on more than expert speculation that he or she poses a risk of relapse
 
 *308
 
 or reverting to violent behavior once medical treatment and supervision are discontinued. The prosecution may meet its burden of proving that a defendant poses a current threat to himself or others warranting confinement in a secure environment, for example, by presenting proof of a history of prior relapses into violent behavior, substance abuse or dangerous activities upon release or termination of psychiatric treatment, or upon evidence establishing that continued medication is necessary to control defendant’s violent tendencies and that defendant is likely not to comply with prescribed medication because of a prior history of such noncompliance or because of threats of future noncompliance
 
 (see, e.g., Matter of Francis S.,
 
 206 AD2d 4, 17,
 
 supra).
 
 Dependence upon factors such as these — clearly evidencing a defendant’s threat to himself or society — is warranted to justify the significant limitations on an insanity acquitee’s liberty interest which accompany secure confinement.
 

 Although neither the nature of appellant’s prior criminal act nor the statistical probability of relapse standing alone is sufficient to establish current dangerousness, here there was more: the peculiar circumstances of appellant’s
 
 relapse
 
 after leaving St. Francis. That appellant’s behavior had already once frustrated the presumably reasonable expectations of mental health professionals,
 
 [6]
 
 combined with the violent nature of his criminal act and the statistical probability of relapse affecting paranoid schizophrenics generally, plainly supported the determination of the trial court, affirmed by the Appellate Division, that the statutory standard was satisfied here.
 

 V.
 

 Finally, relying on the Supreme Court’s recent decision in
 
 Foucha v Louisiana
 
 (504 US 71 [1992]), appellant argues that the trial court improperly shifted to him the burden of proving his lack of dangerousness. This argument
 
 *309
 
 lacks merit as well, as is evident from the opening words of the trial court’s decision: "[t]he court finds that the People have sustained their burden of proof.” Moreover, the Louisiana statute at issue in
 
 Foucha
 
 — as opposed to the GPL provisions applicable here — did not require any showing that the defendant was in fact still mentally ill at the time of recommitment
 
 (Faucha,
 
 504 US, at 73-74), whereas here appellant’s diagnosis as a paranoid schizophrenic is undisputed.
 

 VI.
 

 Accordingly, the order of the Appellate Division should be affirmed, without costs.
 

 Judges Simons, Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed, without costs.
 

 [1]
 

 . Shortly after his arrest and initial commitment, appellant sent the trial court a handwritten letter, addressed to "Dear Fish Market and Fish marketeers,” stating "I am unwillfully held against my grain and clearfully arraign I am sane. * * * I would willfully oblige you to conduct your principals accordingly. The time is growing nearer and end is clear”.
 

 [2]
 

 . Although appellant is no longer confined in a secure facility, having been subsequently found to be mentally ill but no longer dangerous, his appeal is not moot. Appellant’s denomination as a "track 1” defendant — the issue on appeal — affects his status in all future proceedings concerning his commitment. As we noted in
 
 Williams v Cornelius
 
 (76 NY2d 542, 546), review of a criminal contempt finding "is not rendered moot merely because the sentence has been served * * * Inasmuch as lasting consequences potentially flow from the adjudication, the proceeding remains ripe for judicial review.”
 
 (See also, People v Salem,
 
 122 AD2d 85.)
 

 [3]
 

 . Our decision today thus does not extend to the necessarily higher procedural and substantive requirements for depriving an individual of his or her liberty interest in the context of an involuntary civil commitment.
 
 (See,
 
 Mental Hygiene Law § 9.39 [a];
 
 People v Escobar,
 
 61 NY2d 431, 440-441,
 
 supra;
 
 1981 Report of NY Law Rev Commn, 1981 McKinney’s Session Laws of NY, at 2264.)
 

 [4]
 

 . In addition, only three months prior to the January 2 hearing, in November, the staff at Mid-Hudson discovered that appellant had violated hospital regulations by keeping matches in his locker. When confronted with the matches, defendant stated to the staff at Mid-Hudson that someone had planted them there and that they "shouldn’t f---with me.”
 

 [5]
 

 .
 
 See also,
 
 Perlin,
 
 Unpacking the Myths: The Symbolism Mythology of Insanity Defense Jurisprudence,
 
 40 Case W Res L Rev 599, 693 (1990) ("The voluminous literature examining the ability of psychiatrists [or other mental health professionals] to predict dangerousness in the indeterminate future has been virtually unanimous: 'psychiatrists have absolutely no expertise in predicting dangerous behavior’ ”) (quoting Ennis & Litwack,
 
 Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,
 
 62 Cal L Rev 693, 734-735 [1974]).
 

 [6]
 

 . Both of the psychiatrists who submitted reports to the trial court on appellant’s behalf concluded that appellant could "safely be treated in a nonsecure facility,” without expressly mentioning whether appellant was dangerous. We mention this only to emphasize that such opinions are insufficient to allow a court to make an appropriate determination under CPL 330.20 — as the statute does not require a court to determine an individual’s suitable course of psychiatric treatment, but rather whether such individual "currently constitutes a physical danger to himself or others.”