**JOHN M., Petitioner,**

v.

**James STONE, Commissioner, New York State Office of Mental Health, and Richard Bennett, Executive Director, Mid–Hudson Forensic Psychiatric Center, Respondents.**

**No. 99 Civ. 2726 (WCC).**

United States District Court, S.D. New York.

Oct. 25, 1999.

Sidney Hirschfeld, Director, Mental Hygiene Legal Service, Second Judicial Department, Mineola, NY (Valdi Licul, Dennis B. Feld, of counsel), for Petitioner.

Eliot Spitzer, Attorney General of State of New York, New York City (Tanya M. Fairclough, Asst. Attorney General, of counsel), for Respondents.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Petitioner, a patient at the Mid–Hudson Forensic Psychiatric Center ("MHFPC"), commenced this federal habeas corpus proceeding to challenge the lawfulness of his retention at MHFPC. Petitioner claims that his continued psychiatric confinement violates the Due Process Clause of the Fourteenth Amendment because he is neither mentally ill nor dangerous.

## BACKGROUND

### I. *Petitioner's Background*

Petitioner is a thirty-six-year-old male who has been institutionalized almost continuously since he was five years old. He has a history of substance abuse that began when he was nine years old. When he was fifteen years old, petitioner was arrested for armed robbery. When he was seventeen years old, while under the influence of various narcotics, including PCP, petitioner attacked his thirteen-year-old sister with a knife. This attack caused petitioner's sister to jump out of a sixth-story window to her death. Petitioner was charged with Murder in the Second Degree and then adjudicated not responsible by reason of mental disease or defect and committed to the custody of the Commissioner of the New York State Office of Mental Health.

Petitioner became a patient at MHFPC as a result of being found not responsible for his sister's death by reason of mental disease or defect. He remained there until 1983, when he was transferred to the Manhattan Psychiatric Center ("MPC"), a non-secure facility. Petitioner escaped from MPC in 1983 by tying together twenty-five bed sheets and climbing down from the ninth floor of the building. He was caught a few days later hiding in a hotel in Bronx County. After being convicted of the crime of escape, petitioner spent two years in prison.

Petitioner was then sent to Creedmoor Psychiatric Center ("CPC"), a non-secure facility. In 1987, petitioner escaped from CPC and went to California. He was found one month later and sent to Kirby Forensic Psychiatric Center, a secure facility. While at Kirby, petitioner conceived a daughter with another patient. His daughter is currently in foster care. In 1991, petitioner was transferred to MPC where he remained until his most recent transfer to MHFPC.

During his stay at MPC, petitioner presented management problems. In 1996, petitioner hit another patient in the face in self defense. He was also domineering in community meetings with other patients. As the result of an administrative error, petitioner was told that he could leave MPC grounds unescorted in 1997. The error was later corrected, but petitioner left MPC grounds in May 1997 even though he knew that his departure was unauthorized. Petitioner claims that he was attending a Narcotics Anonymous meeting and returned to MPC on his own.

In November 1997, petitioner was transferred to MHFPC because of an incident with the MPC staff. Reports of that incident differ, but it is alleged that the staff made sexually inappropriate comments about petitioner's daughter and taunted petitioner by waving their keys at him and saying that he would never leave the hospital. Petitioner then "cursed out" the staff, and threatened them by saying that he "already had one body under his belt," referring to his sister. There is also a report that during the same incident he barricaded himself in a nurse's station, although petitioner claims that he was trying to call for help in resolving the dispute. There are other reported incidents of petitioner using epithets in reference to the staff.

During the beginning of petitioner's stay at MPC, he continued to abuse and deal drugs. For the past six years, petitioner has been drug-free, according to his own reports and hospital drug tests. He has also converted to the Islamic faith. Petitioner has participated in activities at the hospital, including organizing a bake sale.

### II. *Proceedings Below*

After the incident with the staff at MPC in November 1997, petitioner was readmitted to MHFPC pursuant to a Recommitment Order dated October 30, 1997 (Greenfield, J.). Petitioner sought an order for a rehearing and review of the proceedings and recommitment order. At the review and rehearing on May 6, 1998, the court heard testimony from Dr.

Charles Sarner, Dr. Salil Kathpalia, Dr. Kajal Saha, Dr. Stuart Kiell, Dr. John Lucas, and the petitioner.

### A. Testimony of Dr. Sarner

Dr. Sarner is petitioner's treating psychiatrist. Dr. Sarner's diagnosis of petitioner was that he has an antisocial personality disorder and personality disorder not otherwise specified with qualifiers of impulsive, grandiose and antisocial. Although in January 1998, Dr. Sarner recommended that petitioner be transferred to a non-secure facility, he changed his mind and stated in his testimony that petitioner has a dangerous mental disorder and should not be transferred. Dr. Sarner based his conclusion on petitioner's verbal abuse of the staff, propensity for violence, domination of community meetings, and risk of escape. Dr. Sarner found that these behaviors were reminiscent of reports of his behavior of MPC, behavior which was followed by his escape. Dr. Sarner stated that petitioner has shown no signs of psychosis and has not taken psychotropic drugs in the last six years, but concluded that petitioner suffers from a dangerous mental illness.

### B. Testimony of Dr. Kathpalia

Dr. Kathpalia is the chief of petitioner's unit at MHFPC. Dr. Kathpalia did a comprehensive risk assessment of petitioner. He concluded that he could not guarantee the public safety if petitioner was transferred to a non-secure facility. The factors that Dr. Kathpalia found to be relevant include petitioner's history of violent behavior, lack of motivation for treatment, repeated escapes, difficulty in childhood, history of substance abuse, and his sexual history while in the hospital. Dr. Kathpalia noted that petitioner's substance abuse is in remission only because he is in an institution, or is in "institutional remission," so there is a risk of substance abuse occurring if petitioner leaves the institution. Because "the factors that led him to be violent are still lurking," Dr. Kathpalia

concluded that petitioner has a dangerous mental disorder.

### C. Testimony of Dr. Saha

Dr. Saha is a member of the Hospital Forensic Committee at MHFPC. It was his opinion that petitioner has a dangerous mental disorder. His opinion was based upon petitioner's history of escape risk and noncompliance with hospital rules. Dr. Saha was also concerned with petitioner's substance abuse, particularly the fact that petitioner committed his crime while under the influence and that petitioner abused drugs while in a non-secure facility. Dr. Saha's opinion was also based upon petitioner's inappropriate sexual behavior, evidenced by a female patient's August 1997 complaint that petitioner was bothering and following her. Dr. Saha also found that petitioner had a lack of impulse control and a tendency to be argumentative. Dr. Saha testified that petitioner is dangerous because he threatened to kill the hospital staff and because he had no remorse about his sister's death.

### D. Testimony of Dr. Kiell

Dr. Kiell is the Director of Forensic Services at MPC and was petitioner's treating psychiatrist from the summer of 1994 until the spring of 1997. During that time period, his diagnosis of petitioner was psychosis secondary to substance abuse in remission, antisocial personality traits, and personality disorder not otherwise specified. Dr. Kiell testified that a personality disorder is not mental illness because it cannot be treated in the hospital and is not a cognitive impairment. Thus, despite petitioner's personality disorder and antisocial personality traits, petitioner is not mentally ill, in Dr. Kiell's opinion. Dr. Kiell also noted that during the past six years, petitioner has been drug free, has never physically assaulted any hospital staff, and "has shown an unusual respect for and concern for other people's feelings." Dr. Kiell characterized petitioner's verbal outbursts as "colorful language,"

but felt that in the case of the incident that precipitated petitioner's transfer to MHFPC, petitioner was provoked and the staff overreacted.

### E.   *Testimony of Dr. Lucas*

Dr. Lucas was appointed by the court as an independent psychiatrist and examined petitioner on January 30, 1998. Dr. Lucas found that petitioner's reality testing was clearly intact, and petitioner was not suffering from delusions or hallucinations. Dr. Lucas's diagnosis was poly substance abuse in remission and mixed personality disorder with narcissistic and impulsive traits. In his opinion, the remission was not merely institutional remission, because petitioner refrained from drug use even when he had access to drugs in the hospital. According to Dr. Lucas, a personality disorder is a long-standing pattern of maladaptive ways of relating to oneself and to others, and is usually treated outside the hospital. Dr. Lucas's opinion is that petitioner does not have a mental disease or illness because a personality disorder is not a mental illness. Signs of mental illness are maladaptive behaviors which would interfere with his potential to function as an out-patient. Dr. Lucas testified that petitioner can be treated outside of a secure facility, and in fact, petitioner would be at less risk of acting in a violent way while out in the community than while in a secure hospital setting.

### F.   *Testimony of the Petitioner*

The petitioner testified that he regretted what happened to his sister and was willing to do whatever the court orders as a condition to make sure that he is safe. He also noted that he attends Narcotics Anonymous meetings to stay clean. Petitioner stated that he would not escape from a non-secure facility even if he could.

### G.   *State Supreme Court's Decision*

The State Supreme Court found that petitioner suffers from a dangerous mental illness, specifically an antisocial, impulsive personality disorder. The court issued a First Retention Order mandating petitioner's involuntary confinement for one year. Petitioner has exhausted his state remedies by applying for, but being denied, permission to appeal to the Appellate Division of the New York State Supreme Court. Therefore, petitioner's habeas corpus proceeding is properly before this Court.

## DISCUSSION

### I.   *Standard of Review*

The standard of review in a habeas proceeding for claims which have been adjudicated on the merits in state court is governed by 28 U.S.C. § 2254. Under § 2254(e)(1), state court determinations of fact are presumed to be correct. Issues of fact concern "basic, primary, or historical facts," or facts that go toward "what happened." *Thompson v. Keohane*, 516 U.S. 99, 109–10, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (citations omitted). The question of mental competency is a mixed question of law and fact. *See Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir.1993); *see also Francis S. v. Stone*, 995 F.Supp. 368, 387 (S.D.N.Y.1998) (noting that "at least one court has found that determination of an insanity acquitee's mental illness and dangerousness for purposes of recommitment is a mixed question of law and fact," but deciding that even without the presumption of correctness, more than sufficient evidence was presented to justify the state court's decision). Therefore, the presumption of correctness does not apply to the state court's finding that petitioner is dangerous and mentally ill.

Subsection 2254(d)(2) defines the standard of review to be applied to mixed questions of law and fact. The federal court must defer to the state court's decision provided it "does not constitute an 'unreasonable application' of clearly established federal law." *Rodriguez v. Bennett*, 1998 WL 765180 at *3, 98 Civ.580 (Nov.2,

1998) (quoting *Carter v. Johnson*, 110 F.3d 1098, 1110 (5th Cir.1997)). Accordingly, this Court may only grant relief if "reasonable jurists considering the question would be of one view that the state court ruling was incorrect." *Id.* (quoting *Smith v. Sullivan*, 1 F.Supp.2d 206, 211 (W.D.N.Y. 1998)).

## II. *Mentally Ill and Dangerous*

■ A not-responsible acquitee may be involuntarily retained "as long as he is both mentally ill and dangerous, but no longer." *See Foucha v. Louisiana*, 504 U.S. 71, 77, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).

### A. *Mentally Ill*

New York law defines mental illness as:

an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation.

N.Y. Mental Hyg. Law § 1.03.

■ Five psychiatrists testified at the state rehearing of the recommitment order. All five psychiatrists agreed that petitioner suffers from either a personality disorder or antisocial personality traits. Three of the five psychiatrists, Doctors Sarner, Kathpalia, and Saha, agreed that as a result of the personality disorder, petitioner is mentally ill. In contrast, all eleven expert witnesses in *Levine* testified that the petitioner was not mentally ill. *Levine*, 986 F.2d at 1513.

Dr. Kiell and Dr. Lucas both testified that a personality disorder is not a mental illness. Dr. Kiell testified that a personality disorder is not a mental illness because it cannot be treated in a hospital. But in *In Matter of Mental Hygiene Legal Services ex rel. James "U" v. Rhodes ("James U ")*, the court rejected this argument, finding that even if the effectiveness of treatment of an antisocial personality disorder in a hospital setting can be disputed,

that "does not mean that petitioner cannot be institutionalized." 195 A.D.2d 160, 162, 606 N.Y.S.2d 834, 835 (1994); *see also Parrish v. Colorado*, 78 F.3d 1473, 1478 (10th Cir.1996) (rejecting argument that antisocial personality disorder cannot be treated, and therefore does not merit institutionalization). Because three out of five psychiatrists, as well as the courts in *James U* and *Parrish*, agree that petitioner's antisocial personality disorder is a mental illness, it cannot be said that reasonable jurists would find that the state court was incorrect.

Even without giving deference to the state court's finding that petitioner is mentally ill, an examination of the doctors' testimony supports the conclusion that petitioner is mentally ill. Petitioner has a history of violent behavior and substance abuse. Although petitioner has been drug-free for the past several years, it is not clear that he will refrain from drug use if released. In *Thornblad v. Olson*, the petitioner was found to be dangerously mentally ill because he asserted that he was in charge of the prison and threatened the governor and numerous judges. 952 F.2d 1037, 1039 (8th Cir.1992). Although his behavior was not as extreme as that of the petitioner in *Thornblad*, petitioner here has attempted to assert control or dominance over situations in the hospital, threatened hospital staff, and demonstrated an inability to control his verbal outbursts. Considering the totality of petitioner's infirmities, such as his history of drug abuse, history of violence, recent verbal outbursts and threats, it was reasonable for the state court to determine that petitioner is mentally ill.

### B. *Dangerous*

■ Petitioner must also be found dangerous in order to be recommitted. The state must show some "identified and articulable threat to an individual or the community." *Foucha*, 504 U.S. at 81, 112 S.Ct. 1780 (citations omitted). In *In the Matter of George L.*, the court considered

the petitioner's violent crime in determining whether the petitioner was currently dangerous because the crime occurred only seventeen months prior to the commitment hearing. 85 N.Y.2d 295, 306, 624 N.Y.S.2d 99, 648 N.E.2d 475 (1995) ("*George L.*"). Although petitioner's attack on his sister occurred many years ago, he hit another patient as recently as 1996, allegedly harassed a female patient in 1997, and verbally threatened violence against the staff in November 1997. It was reasonable for the state court to find that petitioner was still dangerous at the time of his recommitment.

In *George L.*, the court listed factors that can be considered in determining whether petitioner is dangerous. These factors include: history of relapses into violent behavior, substance abuse that may continue upon release from treatment, evidence proving that continued medication is necessary, and a history of noncompliance with treatment. 85 N.Y.2d at 308, 624 N.Y.S.2d 99, 648 N.E.2d 475. Again, although petitioner has been involved only in one physical altercation since being hospitalized, and that was in self-defense, petitioner has threatened violence and may have barricaded himself in the nurse's station. In addition, petitioner abused drugs for many years, including while at a non-secure facility. At least one psychiatrist, Dr. Kathpalia, believes that petitioner's remission from substance abuse is institutional and petitioner could return to drug abuse if released. Also significant are petitioner's repeated escapes from non-secure facilities. The escapes indicate that petitioner has a history of noncompliance with treatment and raise questions about petitioner's willingness to seek necessary treatment as an out-patient. Without treatment, especially for petitioner's drug abuse problems, petitioner would be dangerous to the public. Therefore, it was reasonable for the state court to determine that petitioner is currently dangerous.

The state court's determination that petitioner is dangerously mentally ill was not an unreasonable application of the law. The majority of experts testifying found that petitioner is mentally ill and dangerous. Upon consideration of petitioner's recent verbal outbursts, threats, history of drug abuse, and noncompliance with treatment, this Court cannot conclude that continued psychiatric confinement of petitioner would violate his constitutional rights.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is denied.

**SO ORDERED.**