■ In the Matter of MICHAEL RR., Respondent. COMMISSIONER OF MENTAL HEALTH, Appellant. [728 NYS2d 222] —Spain, J. Appeal, by permission, from a judgment of the Supreme Court (Nolan, Jr., J.), entered February 21, 2001 in Albany County, which, upon a rehearing, denied petitioner's application pursuant to CPL 330.20 to continue to retain respondent at an unsecure psychiatric facility and directed release of respondent under certain conditions.

The relevant facts in this matter are contained in a previous decision of this Court (233 AD2d 30, *lvs dismissed* 91 NY2d 921, 92 NY2d 886). Briefly, in 1984, respondent was charged with murder in the second degree, manslaughter in the first degree and criminal use of a firearm in the first degree, relating to the shooting death of his uncle. At that time, respondent reported that his uncle had raped him several years earlier and was humiliating him by telling people in the community of the rape. Respondent subsequently entered a plea of not responsible by reason of mental disease or defect, after which a hearing was held pursuant to CPL 330.20 (6). The County Court of Schenectady County found that respondent suffered from a "dangerous mental disorder" (*see*, CPL 330.20 [1] [c]; [6]) and issued a commitment order placing respondent in petitioner's custody for confinement in a secure facility. After Supreme Court, Orange County, determined in 1989 that respondent was still suffering from a mental illness but no longer suffered from a dangerous mental disorder (*see*, 233 AD2d 30, 31-32, *supra*), he was transferred to the Capital District Psychiatric Center (hereinafter CDPC) in Albany County, a nonsecure facility, where he thereafter remained pursuant to multiple retention orders (*see*, CPL 330.20 [1], [9]).

In August 1999, petitioner's application for continued retention of respondent at CDPC until September 2001 was granted by Supreme Court (Marinelli, J.) after a hearing. Respondent then sought a rehearing and review pursuant to CPL 330.20 (16) and Mental Hygiene Law § 9.35. A jury trial was held in

February 2001, with the jury unanimously finding that, while respondent still suffers from a mental illness, petitioner had not shown by a preponderance of the evidence that continued inpatient care of respondent was essential. Thereafter, Supreme Court, in a well-reasoned decision, denied petitioner's motion to set aside the jury verdict and this Court granted petitioner's motion for leave to appeal and for a stay pending appeal.

After careful consideration, we affirm, rejecting petitioner's contention that the jury's verdict was, *inter alia*, against the weight of the evidence. On its request to continue nonsecure retention of respondent, "it was incumbent upon petitioner at periodic court reviews to prove 'to the satisfaction of the court' that continued custodial retention was necessary" (233 AD2d 30, 32, *supra*, quoting CPL 330.20 [8], [9]). To obtain the requested subsequent retention order, petitioner was required to demonstrate by a preponderance of the credible evidence that (1) respondent suffers from a mental illness, (2) in-patient services are essential to his well-being, and (3) his judgment is so impaired that he does not understand the need for such care and treatment (*see*, 233 AD2d 30, 31-32, *supra*; *see also*, CPL 330.20 [1] [d]).

We are guided by the precept that a jury verdict is entitled to great deference and, if sufficient evidence exists, the verdict will be sustained even if other evidence in the record would support a contrary result (*see*, *Mannello v Town of Ulster, Post 1748, Am. Legion*, 272 AD2d 804; *see also*, *Matter of George L.*, 85 NY2d 295, 305). Importantly, a jury verdict may be set aside as against the weight of the evidence " 'only when the evidence preponderates so greatly in the movant's favor that the jury could not have reached its conclusion on any fair interpretation of the evidence' " (*Sprung v O'Brien*, 168 AD2d 755, quoting *Frasier v McIlduff*, 161 AD2d 856, 858; *see*, *Lolik v Big V Supermarkets*, 86 NY2d 744; *Monahan v Devaul*, 271 AD2d 895, 895-896; *Santalucia v County of Broome*, 228 AD2d 895; *Stanavich v Pakenas*, 190 AD2d 184, *lv denied* 82 NY2d 659).

At the trial, a retired police officer testified for petitioner regarding respondent's 1984 apprehension and the taking of respondent's statement in which he admitted to the shooting death of his uncle. Testimony was also elicited from a forensic psychiatrist employed by the Office of Mental Health, respondent's treating psychiatrist at CDPC, and a social worker assistant who works with respondent at CDPC. The forensic psychiatrist testified that although she never treated respondent,

she interviewed him on one occasion prior to trial and reviewed some documents in his clinical records. She opined that respondent suffered from paranoid schizophrenia and described how he suffers from delusions, including his belief that CDPC personnel come into his room at night to beat and sexually molest him and that CDPC staff, his family and the legal system have conspired to maintain his confinement. She also stated that respondent did not believe himself to have a mental illness and was unable to understand the nature of his illness or his need for treatment. There were reports of recent odd behavior, e.g., respondent was putting his mattress against the door to his room at night to protect himself from assaults by the staff, he was—on occasion—walking backwards and he was washing his food—including bagels—fearing contamination.

The forensic psychiatrist also detailed two separate incidents of violence, both occurring in 1990, in which respondent assaulted his roommate and a CDPC security guard. She also indicated that respondent has difficulty following rules, but that for a period of time—in 1994 and 1995—he was permitted court-approved, unescorted furloughs into the community to work at his old job as a laborer at the Port of Albany. Those privileges were revoked by CDPC staff because respondent returned to CDPC from a furlough several hours late. She also opined that respondent would be dangerous if released into the community based on his failure to acknowledge his mental illness, his denial of committing the murder for which he was originally confined, the likelihood that he would not continue to take his medication if released, his fear of staff, his anger in general toward his family, his odd behavior and his failure to abide by the rules of CDPC. A key factor in her opinion that respondent is dangerous is that he continues to suffer from delusions and that he had—at least once (in 1984)—acted on his delusions, i.e., his belief that his uncle had sexually molested him and had spread stories throughout the community that he had victimized respondent. She conceded that, since the reported 1990 assaultive incidents, respondent has not engaged in any violent behavior incidents either within CDPC or in the community while on escorted or unescorted furlough. Finally, this witness confirmed that, if respondent were released as a result of the Supreme Court proceedings, any such release would be subject to conditions formulated by CDPC, including court-ordered supervision in the community (*see*, CPL 330.20 [1] [o]; [9], [11], [12]; *see also*, *Matter of*

*Oswald N.*, 87 NY2d 98; *Matter of Jill ZZ.*, 83 NY2d 133, 137-139; *People v Stone*, 73 NY2d 296).*

Respondent's treating psychiatrist also testified, opining that respondent suffered from a delusional disorder, persecutory

---

* Notably, the conditions to which respondent will be subject if released from his inpatient status at CDPC are set forth in an order of Supreme Court issued subsequent to the jury's verdict. This order and the order of release have both been stayed by this Court. The conditions are as follows:

"1) Attend an *outpatient mental health treatment program* as designated by the Commissioner of Mental Health for the State of New York or by his/her designee. Said treatment may include but is not limited to the following:

"a) *Periodic psychiatric assessments or evaluations including medication reviews*;

"b) *Taking medications as directed by the treating physician* and submitting to appropriate laboratory tests for levels of psychotropic and neuroactive medications as directed.

"c) Participating in a variety of group and individual therapy program activities as directed as well as participating in vocational rehabilitation activities;

"2) Reside in housing meeting with the approval of the Commissioner or his/her designee;

"3) Refrain from changing [his] place of residence without the prior approval of the treatment team;

"4) Keep the Commissioner and the District Attorney of Schenectady County apprised of [his] current address;

"5) [Respondent] is prohibited from indulging in the use of any unauthorized drugs and from indulging in the consumption of alcoholic beverages;

"6) Submitting specimens for laboratory/sobriety screenings administered for the purpose of detecting the presence of unauthorized or illicit drugs or alcohol as directed by a physician;

"7) If [respondent] is directed to attend a clinic or program that is not operated by the Commissioner of Mental Health, [he] shall authorize [his] treating clinician to release treatment information and submit semiannual reports to the Commissioner or to his/her designee describing [respondent's] current condition, the extent to which [he] is complying with the treatment plan and with the Order of Conditions, as well as [respondent's] adaptation to community based living, and, if deemed necessary, [respondent] will submit to further psychiatric examination and interview by the staff of the monitoring facility;

"8) If [respondent] receives mental health and/or substance and alcohol treatment and/or emergency services at a hospital or program that is not operated by the Commissioner of Mental Health, [he] shall authorize [his] treating clinician to release treatment information to the Commissioner or to his/her designee describing the treatment or emergency service(s);

"9) [Respondent] is not permitted to apply for a firearm license or own or posses *[sic]* a firearm or other weapons during the effective period of this order" (emphasis supplied).

type. Other than this diagnosis, his testimony mirrored that of the other psychiatrist, including his perception of the delusions harbored by respondent in 1984 which led to the death of his uncle. He added that an act of threatened violence occurred in 1990, in which respondent allegedly made a threatening gesture—by pulling his fingers across his throat—at a janitor who had observed and reported respondent being naked with a female in a CDPC bathroom. Additionally, the treating psychiatrist expressed concern regarding respondent's repeated refusal to take his medication which, in November 2000, led CDPC to request and receive a court order to medicate respondent over respondent's objections. Presently, he believes that respondent is "faking" taking his medications and he opined that respondent would be dangerous if released due to his continued delusions of persecution, his propensity to brood over particularly stressful events and eventually act on them, and his lack of insight regarding his mental illness, particularly as it relates to his willingness to take his medications. On cross-examination, however, this witness testified that respondent never attempted to escape during any of his unescorted furloughs, was not known to have engaged in any dangerous activity while in the community and, when permitted to work at his former job at the Port of Albany, respondent transported himself from CDPC in his own van, with no complaints from his employer or anyone in the community.

The social worker testified that respondent suffers from persecutory delusions, does not believe himself to be suffering from mental illness and has never admitted to her that he killed his uncle. She also reviewed her November 1999 risk assessment regarding respondent which indicates that respondent is not at risk for suicide, self-injury, interpersonal violence or noncompliance.

Respondent testified, explaining that his 1990 altercation with his roommate occurred after his roommate, who outweighed respondent by 60 to 70 pounds, jumped on top of respondent while he slept, and respondent began to choke him in defense. He admitted to pushing the security guard but denied having made a threatening gesture at the CDPC janitor. With regard to his returning late from work, which caused the revocation of his unescorted work furloughs, respondent testified that he was visiting his son who lived in Schenectady County with his son's mother—respondent's former girlfriend—and fell asleep, causing him to return late to CDPC. Respondent also denied having shot his uncle and expressed his belief that there is a conspiracy to keep him confined.

Several pieces of documentary evidence pertaining to respondent were admitted, including a 1991 staff request for unescorted ground privileges and escorted furloughs, which indicated that respondent's mother and aunt had expressed belief that respondent's uncle had raped him and indicated that it would have been entirely consistent with the uncle's character to "spread stories regarding those he had victimized." A 1995 inpatient annual psychiatric evaluation update indicates that restriction to the inpatient unit exacerbates respondent's mental illness, and other documentary evidence established that respondent functioned well in the community while on furlough without any medication at all.

In summary, it is clear that the jury was presented with overwhelming proof that respondent suffers from mental illness as opined by the experts. However, the jury rejected the opinions of the experts that continued inpatient care was essential to his well-being. Upon our review of the record, we cannot conclude that the jury's verdict was against the weight of the evidence given, *inter alia*, the 11-year gap between the trial and respondent's most recent acts or threats of violence, one of which respondent denied and one of which respondent explained as being necessitated by his roommate's acts. Indeed, documentary evidence—some of which is inconsistent with the testimony of the psychiatrists—showed that respondent's continued confinement exacerbates his condition and a recent report indicates that respondent has been cooperative and exhibits no dangerous behavior. For these reasons, the evidence before us does not so preponderate in petitioner's favor that no fair interpretation of the evidence would support the jury's conclusion that inpatient services were not necessary to respondent's well-being (*see, Sprung v O'Brien,* 168 AD2d 755, *supra*). This is especially true in light of the fact that, if released from unsecure confinement, respondent would continue to be under the supervision of petitioner and subject to appropriate court-ordered conditions crafted on the recommendations of CDPC. Indeed, the jury was free to disagree with petitioner's experts regarding the factual basis for their conclusions and the need to treat respondent's mental illness on an inpatient basis. Finally, petitioner's claim that the jury's conclusion that respondent suffers from mental illness necessitated a finding that he requires inpatient care is without merit, as mental illness alone is insufficient to continue respondent's confinement at CDPC (*see,* CPL 330.20 [1] [d]; *Matter of Carl C.,* 126 AD2d 640).

Mercure, J. P., Peters and Mugglin, JJ., concur. Ordered that the judgment is affirmed, without costs.