Matter of Belfi v Gene B. (2023 NY Slip Op 03751)

Matter of Belfi v Gene B.

2023 NY Slip Op 03751

Decided on July 06, 2023

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: July 06, 2023

Before: Kapnick, J.P., Kern, Gesmer, Moulton, Higgitt, JJ. 

Index No. 530085/22 Appeal No. 17534-17534A Case No. 2022-01041 

[*1]In the Matter of Brian Belfi etc., Petitioner-Respondent,
v
Gene B. (Anonymous), Respondent-Appellant, District Attorney, Kings County, Respondent.

Marvin Bernstein, Mental Hygiene Legal Service, New York (Naomi M. Weinstein of counsel), for appellant.
Letitia James, Attorney General, New York (Elizabeth A. Brody of counsel), for Brian Belfi, respondent.
Eric Gonzalez, District Attorney, Brooklyn (Sara Dayan of counsel), for District Attorney, Kings County, respondent.

Orders, Supreme Court, New York County (David B. Cohen, J.), entered on or about February 15, 2022, which granted petitioner's applications for first and second retention orders pursuant to CPL 330.20 for continued confinement of respondent in a secure facility, unanimously affirmed, without costs.
In March 2019 respondent entered a plea of not responsible by reason of mental disease or defect (CPL 220.15) to satisfy charges brought in connection with a 2017 homicide. He seeks reversal of two orders of retention that have resulted in his continued admission in Kirby Forensic Psychiatric Center (Kirby), a secure treatment facility. We now affirm.
Respondent's mental health issues first manifested in 2011. At that time, he began keeping detailed records on the residents in his building. He also sought treatment for anxiety and depression, which he attributed to harassment by his neighbors and his superintendent. As the years progressed, respondent's condition worsened.
On March 6, 2017, respondent shot and killed his building superintendent, impelled by the delusion that the superintendent wanted to hurt him and his granddaughter. Respondent believed, among other things, that the superintendent or his neighbors took the following actions: wiretapped his apartment, placed cameras in his apartment to film him and his granddaughter, tampered with his food, and sprayed chemicals on his sheets. None of these beliefs had any objective foundation. Respondent also heard voices and covered the light fixtures and the television in his apartment with blankets and duct tape.
Respondent was diagnosed with schizophrenia in 2018. After entering his plea, respondent was admitted to Kirby on March 25, 2019. On February 14, 2020, petitioner applied for a first retention order for a period of one year. On February 11, 2021, petitioner applied for a second retention order for a period of two years. When petitioner applied for the second retention order, the first retention order was still pending as the result of the pandemic. The second retention order expired on February 14, 2023. However, the appeal is not moot because 1) retention orders are generally of short duration and for that reason typically evade review, 2) the same issues presented here are likely to reoccur in connection with any future retention order, and 3) the issues before us are substantial (see Matter of New York State Off. of Mental Health v Marco G., 167 AD3d 49, 55 [1st Dept 2018]).
On January 19 and 20, 2022, Supreme Court held a combined hearing on the first and second retention orders. The hearing was held virtually due to the pandemic. Petitioner presented the expert testimony of Dr. Jonathan Lam, a psychologist, and Dr. James Hicks, a psychiatrist, who were both employees at Kirby.
In support of retention, Dr. Lam and Dr. Hicks testified that respondent's paranoid delusions were in "partial remission" and that respondent had "partial insight" into the connection between his mental [*2]illness and the potential for future violence. Both Dr. Lam and Dr. Hicks noted that respondent had "superficial" engagement with group therapy and the treatment team, and that respondent hid his symptoms by, among other things, avoiding engagement. Dr. Lam and Dr. Hicks also testified that respondent's antipsychotic medication is probably not at the optimal therapeutic level.
Critically, both experts testified that respondent suffered from schizophrenia with a "late onset." Dr. Lam explained that individuals who develop late onset schizophrenia often present as more functional and less symptomatic than is typical for individuals who develop schizophrenia in early adulthood (i.e., the 20s). As a result, Dr. Lam explained that if respondent is not asked the right questions or if he is not "pressed" for details, he might appear less dangerous than he is. Moreover, according to Dr. Lam, a transfer to a civil facility, which is also known as a nonsecure facility, at this point presents a danger because the focus in such a facility is on transition to the community while the focus in a secure facility is on mitigation of the risk for violence. Dr. Lam acknowledged that there may be locked wards at a civil facility, but he stressed that, unlike a secure facility, the employees at a nonsecure facility are not trained to handle respondent in his current state. Dr. Hicks similarly expressed this concern, cautioning that respondent would fly "under the radar" in a nonsecure facility.
Although Dr. Lam and Dr. Hicks opined that respondent continues to suffer from a dangerous mental disorder, they acknowledged respondent's recent progress at Kirby. Dr. Lam noted that respondent is now behaviorally stable; attends group therapy (although he is only superficially engaged); takes his medications as prescribed; and is entitled to the highest level of privileges that a patient can receive at Kirby in light of his good behavior. Dr Hicks further acknowledged that respondent's current treating psychiatrist, Dr. Formica, wrote six progress notes between June 26, 2021, and January 18, 2022, stating that respondent is not delusional.
Dr. Lam testified consistently with his examination report dated January 15, 2021, which was based on a 90-minute interview with respondent on December 2, 2020; his discussions with the treatment team on December 18, 2020; and his review of certain reports. His testimony was also consistent with his Hospital Forensic Committee report dated February 9, 2021, based on his evaluation of respondent on January 27, 2021. Dr. Hicks testified consistently with his earlier examination report dated January 31, 2020, which was based on his 90-minute interview with respondent on January 13, 2020; his discussions with respondent's treating psychiatrist after that interview; and his review of certain reports. Dr. Hicks testified that he wanted to reexamine respondent in 2021 because he had not met with him since January 2020, but respondent or his attorney [*3]declined to permit the examination.
Respondent and his daughter testified, as well as respondent's expert, Dr. Eric Goldsmith, a New York University Assistant Clinical Professor of Psychiatry, who was formerly a clinical director at Kirby. Respondent testified that he understands that he has schizophrenia, that he needs to be on medication for the rest of his life, and that the medications help treat his symptoms. He explained that he is interested and involved in his treatment. Respondent explained his relapse plan and described his coping skills. He also described feelings of remorse about shooting his victim.[FN1]
Respondent's daughter testified that she speaks to her father multiple times per week and that she has visited him five times. She explained that her father seems calmer, has a good understanding of his situation, and is willing to continue medication and therapy.
Dr. Goldsmith testified for respondent based on over eight hours of interviews with respondent over the course of two to three months starting in late 2021. He also spoke with respondent's family. Dr. Goldsmith prepared a report which was admitted into evidence at the hearing.
Unlike Dr. Lam and Dr. Hicks, Dr. Goldsmith opined that respondent no longer suffers from a dangerous mental disorder. In his opinion, the treatment at Kirby was so effective that it "cleared [respondent's] mind and resolved the delusions" such that respondent could be transferred to a civil facility with a locked ward. Dr. Goldsmith also testified that respondent gained insight into his illness over his three years at Kirby, is forthcoming about his symptoms and feelings, is engaged in his treatment (although he conceded that some treatment notes reflect superficial engagement), is compliant with medication, and realizes that he will need medication for his entire life.
Dr. Goldsmith acknowledged that treatment notes for the period December 2020 through March 2021 reflect that respondent had "diminished insight and judgment and even remnants of delusional thinking." Dr. Goldsmith explained that respondent's doctor took him off antipsychotic medication in September 2020 because respondent did not appear psychotic. Dr. Goldsmith explained that the doctor restarted the antipsychotic medication in January 2021 when respondent became symptomatic.
In an oral decision from the bench, the hearing court found that respondent still suffers from a dangerous mental disorder and that a transfer to a nonsecure facility is "premature." The hearing court explained that it credited the testimony of Dr. Lam and Dr. Hicks over the testimony of Dr. Goldsmith. The hearing court expressly rejected Dr. Goldsmith's testimony that respondent had insight into his condition. Rather, the hearing court found, as petitioner's experts opined, that respondent knew the "right things" to say to get out of Kirby. According to the hearing court, respondent failed to realize the horrific nature of what he did. The hearing court also [*4]noted that, at the hearing, respondent exhibited "little or none of the emotional response that you would expect from a patient who demonstrates any true level of insight into his illness" and did not display "an appropriate emotion" demonstrating remorse.
Petitioner established by a preponderance of the evidence that respondent continues to suffer from a dangerous mental disorder, as defined in CPL 330.20(1)(c), requiring confinement in a secure facility, as opposed to a mental illness, as defined in CPL 330.20(1)(d), requiring confinement in a nonsecure facility (see Matter of Kirby Forensic Psychiatric Facility v Karmi K.W., 211 AD3d 532 [1st Dept 2022]; Matter of New York State Off. of Mental Health v Joseph C., 126 AD3d 477 [1st Dept 2015]).
In adjudicating whether to retain an insanity acquittee at a secure psychiatric facility, a court must weigh various factors, including:
"(1) the nature and recency of the patient's criminal act; (2) the history of relapses into violence; (3) the history of drug use and other dangerous behavior upon release; (4) the likelihood of future compliance with medical treatment; (5) the patient's insight into the underlying mental illness; and (6) the patient's willingness to accept responsibility for criminal or dangerous acts" (Matter of Carpinello v Floyd A., 23 AD3d 179, 182 [1st Dept 2005]).
Notably, there also is "a presumption that the mental illness found to have caused the defendant's dangerousness continues after the commission of the crime" (Matter of George L., 85 NY2d 295, 306 [1995]).
Here, the hearing court properly weighed the relevant factors, crediting the expert testimony of Dr. Lam and Dr. Hicks over the testimony of Dr. Goldberg (see id. at 305 ["the trier of fact is in the best position to . . . evaluate the weight and credibility of the often conflicting testimony of the medical and psychiatric experts"]).[FN2]
Admittedly Dr. Formica's recent notes reflect that respondent is not delusional. However, the court was entitled to consider petitioner's experts' testimony that it is very difficult to gauge whether respondent has psychotic beliefs beneath the surface and that respondent can hide his symptoms. The difficulty in evaluating respondent was evidenced by the fact that one of respondent's doctors briefly stopped his antipsychotic medication, incorrectly believing that respondent did not need it. Consequently, the hearing court was entitled to give less weight, or no weight, to Dr. Formica's notes.
Moreover, even if respondent was no longer delusional by mid-2021, that fact alone is not dispositive. The hearing court was entitled to credit Dr. Lam's and Dr. Hicks' testimony that respondent only had "partial insight" into the connection between his mental illness and the potential for future violence and that, without insight, respondent could commit another violent act. This testimony is also supported by other evidence. Dr. Formica's January 18, 2022, note states that respondent's "insight [*5]and judgment are poor, because he does not feel the need to see the treatment team regularly, because he believes that he does not have any problems, and that he has nothing to talk about." The November 12, 2021, note from treating psychologist Dr. Patricia Lee indicates that respondent did not speak to the team on a regular basis because he thought "I really don't have any problems." Finally, despite the evidence demonstrating that respondent has made significant recent improvements at Kirby, the hearing court was entitled to conclude, as it did, that respondent's release to a nonsecure facility was "premature" (see Karmi K.W., 211 AD3d at 533 [a "brief improvement within a secure psychiatric institution does not establish that he no longer poses a danger to himself or others and should be placed in a nonsecure facility"]; see also Matter of George L., 85 NY2d at 305; Matter of Jamie R. [New York State Commr. of Mental Health], 174 AD3d 623, 624 [2d Dept 2019]; Matter of Commissioner of Off. of Mental Health v Glenn B., 44 AD3d 517 [1st Dept 2007]).[FN3]
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: July 6, 2023

Footnotes

Footnote 1:Dr. Hicks testified that respondent lacked remorse. Dr. Lam testified that it was unclear whether respondent's remorse was genuine. Both these opinions are speculative because they derive from an ambiguous comment in Dr. Formica's January 18, 2022 note. In that note, Dr Formica indicated that respondent told his treatment team that the victim was "a low life drug addict." It appears however that this comment recounts respondent's past statements and feelings. It is highly unlikely that Dr. Formica would have concluded, in the same note, that respondent has no current delusions or illusions if respondent still blamed his victim for respondent's own act of violence, which would evince both a lack of remorse and delusional thinking.

Footnote 2:Although the hearing court correctly determined that petitioner met its burden of proof based on the testimony and evidence, the court should not have relied on its own opinion that respondent did not demonstrate the emotional response at the hearing that the court would have expected. While fact finders assess demeanor and draw conclusions "based on their day-to-day experience, their common observation and their knowledge," they should not do so when their conclusions require the aid of "the specialized knowledge of an expert witness"(see People v Cronin, 60 NY2d 430, 433 [1983]; see also Matter of Kirby Forensic Psychiatric Facility v Sammy M., 199 AD3d 485 [1st Dept 2021] [the hearing court's determination that the respondent did not suffer from a dangerous mental disorder based on the court's positive view of respondent's demeanor at the hearing was not entitled to deference where the unrebutted expert testimony demonstrated that the respondent should be retained]). Here, no expert testified as to the expected emotional response from a person diagnosed with schizophrenia who testifies at a court hearing. In fact, as respondent points out in his appellate brief, a symptom of schizophrenia is "diminished emotional expression" (American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders [5th ed. 2022 [DSM V-R] at 88). Therefore, we do not rely on that finding by the hearing court.

Footnote 3:We note that respondent pleaded "not responsible by reason of mental disease or defect" (CPL 220.15 [emphasis supplied].) The phrase appears elsewhere in the CPL and in the Family Court Act. When speaking of persons diagnosed with a mental illness(es), the American Psychological Association advises that "[t]he overall principle for using disability language is to maintain the integrity (worth and dignity) of all individuals as human beings" (https://apastyle.apa.org/style-grammar-guidelines/bias-free-language/disability [accessed May 24, 2023]). Synonyms for "defect" include words such as "imperfection or abnormality," "shortcoming," and "flaw" (Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/defect [accessed May 24, 2023]). Merriam-Webster also notes that, when used as an adjective to refer to someone with a mental or physical disability, the term defective is "dated, now offensive" (https://www.merriam-webster.com/dictionary/defective [accessed May 24, 2023]). In May 2021, the New York State Legislature enacted a new law, Chapter 351, to amend various statutes (see L 2021, ch 351, as amended). The purpose of the amendment was to "remove outdated and insensitive language from the law as it relates to any person living with a mental disability" and to remove "any descriptive suggestion that they are any less than any other person under the letter of the law" (Senate Mem in Support, L 2021, ch 351, 2021 McKinney's Sess Law of NY at 2463). A similar legislative examination of the language that appears in CPL 220.15 might be warranted.