## State of New York
### Supreme Court, Appellate Division
### Third Judicial Department

Decided and Entered:  February 18, 2016               521689
_____

In the Matter of JOHN Z.

COMMISSIONER OF MENTAL HEALTH,
                    Respondent;            MEMORANDUM AND ORDER

JOHN Z.,
                    Appellant.
_____

Calendar Date:  February 8, 2016

Before:  McCarthy, J.P., Egan Jr., Rose, Devine and Clark, JJ.

_____

        Sheila E. Shea, Mental Hygiene Legal Service, Albany
(Jeremy J. Best of counsel), for appellant.

        Eric T. Schneiderman, Attorney General, Albany (Jeffrey W.
Lang of counsel), for respondent.

_____

McCarthy, J.P.

        Appeal, by permission, from an order of the Supreme Court
(Pritzker, J.), entered August 28, 2015 in Washington County,
which, in a proceeding pursuant to CPL 330.20 (14), found that
respondent has a dangerous mental disorder and recommitted him to
the custody of petitioner for a period of six months.

        In the mid-1980s and during the span of an afternoon and
evening, respondent stabbed to death his mother, father and
brother, and then, in the course of an apparent suicide attempt,
killed a stranger.  Eventually, respondent was found not guilty
by reason of mental disease or defect in regard to two of the
killings, but found guilty of manslaughter in the first degree
and manslaughter in the second degree in regard to the remaining

killings. With respect to the convictions, respondent was sentenced to a prison term of 13⅓ to 40 years. With regard to the counts upon which he was found not guilty by reason of mental disease or defect, respondent was ordered to be committed to the custody of petitioner for confinement in a secure facility for a period of six months. Apparently, respondent was not thereafter committed to the custody of petitioner for confinement, and he instead proceeded to begin serving his prison sentence. In September 2005, respondent was conditionally released to Grace House, a residential home for recent parolees. Respondent's parole was revoked following an August 2006 violation, and he was returned to the custody of the Department of Corrections and Community Supervision.

Prior to the expiration of respondent's maximum prison sentence, petitioner commenced this proceeding for a recommitment order pursuant to CPL 330.20 (14). Following a hearing (see CPL 330.20 [14]), Supreme Court determined that respondent suffered from a dangerous mental disorder and directed that he be recommitted to petitioner's custody for confinement in a secure facility for a period of six months. Respondent, by permission, now appeals.

Initially, we reject respondent's contention that due process renders a current diagnosis of antisocial personality disorder (hereinafter ASPD) with narcissistic and paranoid features[1] insufficient as a matter of law to justify civil confinement pursuant to CPL 330.20. More specifically on this point, respondent contends, among other things, that the fact that ASPD, alone, is a legally insufficient diagnosis for the purposes of civil confinement pursuant to Mental Hygiene Law article 10 (see Matter of State of New York v Donald DD., 24 NY3d 174, 191 [2014]) merits the conclusion that a diagnosis of ASPD with narcissistic and paranoid features is a legally insufficient diagnosis for the purposes CPL 330.20. The Supreme Court of the United States has established that "[s]tates retain considerable

---

[1] Respondent does not dispute, for the purposes of this appeal, that he was properly diagnosed with ASPD with narcissistic and paranoid features.

leeway in defining the mental abnormalities and personality disorders that make an individual eligible for [civil] commitment" (Kansas v Crane, 534 US 407, 413 [2002]).  The constitutional guarantee of due process limits that discretion, however, by ensuring that civil commitment is not used as a mechanism to identify and confine the dangerous but "typical [criminal] recidivist[s]" (id. at 413).  With this in mind, proof sufficient to satisfy due process requires proof of a mental condition that causes a person to have serious difficulty in controlling his or her dangerous behavior (see id. at 407).

Civil confinement schemes can, of course, be more restrictive than these constitutional limits.  Accordingly, when the Court of Appeals examined the legal sufficiency of a diagnosis in light of a statutory civil confinement scheme limited to sex offenders, the operative question was the relationship between a diagnosis and a respondent's "difficulty in controlling . . . sexual behavior," because the relevant form of dangerousness pursuant to Mental Hygiene Law § 10.03 (i) was that of committing a sex offense (Matter of State of New York v Donald DD., 24 NY3d at 191).  CPL 330.20 (1) (c), in contrast, does not limit the relevant form of dangerousness in the same manner; it only requires a relationship between respondent's current mental condition and "a physical danger to himself [or herself] or others."

Further, the diagnosis of ASPD with narcissistic and paranoid features is more specific than a generic ASPD diagnosis.  Accordingly, this case does not force us to confront a generic ASPD diagnosis that, as elucidated by expert evidence, "means little more than a deep-seated tendency to commit crimes" (Matter of State of New York v Shannon S., 20 NY3d 99, 110 [2012, Smith J., dissenting], cert denied ___ US ___, 133 S Ct 1500 [2013]).  Therefore, we turn to the expert evidence further clarifying respondent's ASPD diagnosis and its attendant narcissistic and paranoid features.

Expert testimony established that ASPD causes individuals to have "distortions related to their thoughts [and] behaviors, and . . . a reckless disregard for societal norms."  Individuals are diagnosed with narcissistic features when they engage in

"grandiose" thinking, have a "sense of self-importance" and feel "entitled" and possibly omnipotent.  Finally, individuals with paranoid features often have feelings that "people are out to get them."  Considering this evidence, we conclude that a mental condition marked by a disregard for societal norms and specifically amplified by an unreasonably inflated sense of self worth and an irrational attribution of hostile intentions to other people sufficiently distinguishes a respondent from the typical recidivist and has a relationship to the requisite dangerousness pursuant to CPL 330.20.  Accordingly, we conclude that the diagnosis of ASPD with narcissistic and paranoid features is not legally insufficient to support civil confinement pursuant to CPL 330.20.

Next, we turn to the determination that respondent suffers from a dangerous mental disorder requiring commitment in a secure facility.  To support a dangerous mental disorder finding, petitioner must demonstrate, by a preponderance of the evidence, "that [the respondent] currently suffers from a 'mental illness' as that term is defined in [Mental Hygiene Law § 1.03 (20)], and [] that because of such condition he [or she] currently constitutes a physical danger to himself [or herself] or others" (CPL 330.20 [1] [c]; see Matter of Amir F., 94 AD3d 1209, 1210 [2012]; Matter of Arto ZZ., 24 AD3d 947, 947-948 [2005], lv denied 6 NY3d 707 [2006]).  Mental Hygiene Law § 1.03 (20) defines "mental illness" as "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation."  Petitioner "may meet its burden of proving that a [respondent] poses a current threat to himself [or herself] or others . . . by presenting proof of a history of prior relapses into violent behavior, substance abuse or dangerous activities upon release or termination of psychiatric treatment" (Matter of George L., 85 NY2d 295, 308 [1995]; see Matter of Francis S., 87 NY2d 554, 561 [1995]; Matter of Amir F., 94 AD3d at 1210).  While this Court's scope of review is as broad as that of the trial court, this Court will accord appropriate deference based on the fact that the trial court "is in the best position to not only observe [the respondent's] behavior but also [to] evaluate the weight and credibility of the often conflicting medical and

psychiatric experts" (Matter of Eric U., 40 AD3d 1148, 1149-1150 [2007], lv denied 9 NY3d 809 [2007]; see Matter of Amir F., 94 AD3d at 1212).

Upon respondent's release from prison, respondent was ordered to reside at Grace House — run by Saving Grace Ministries — for a period of one year. The chief executive officer (hereinafter CEO) of Saving Grace Ministries explained that respondent was employed in January 2006, but was then terminated from that position due to "issues of intimidation with two female staff members." According to the CEO, respondent became increasingly agitated during his stay, stated that he believed that he was being held hostage, and threatened that he was "going to do something bigger" than a parolee who he specifically referenced. The parolee that respondent had referenced had shot several State Troopers. According to the CEO, during this conversation, respondent's eyes were red, his mouth was foaming and he was acting aggressively. A few days later, respondent assured the CEO that he was "going to start hurting people" and then made similar threats a few days after that. Later, respondent assured the CEO that he "absolutely" wanted to start hurting people and further informed the CEO that he planned to start killing people that day. According to the CEO, respondent acknowledged to his parole officer, who had been summoned, that he currently felt the same way that he had felt at the time that he killed his family. Respondent's parole officer confirmed the CEO's testimony in regard to respondent's statements as to his feelings. Respondent was thereafter arrested for a parole violation. A different parole officer testified to obtaining journal recordings that respondent had previously made "about wanting to kill people."

A licensed clinical social worker testified that she first met respondent in September 2005 and that she was his primary therapist until August 2006. The social worker testified to a particular instance in which respondent discussed visiting his parent's graves. During that discussion, respondent "talked about how huge he felt standing over the graves and that [his parents] were like puppies." On another occasion, respondent informed the social worker that he did not appreciate that she spoke to him "as if he were a child." Respondent also expressed

a particular dislike of certain men who also lived in Grace House, who he described as "black Muslims." His dislike arose from the fact that these men "clean[ed] too much" and "used all [of] the cleaning supplies." In a related discussion regarding respondent's general dislike of black men and respondent's time in prison, respondent explained that, "if it would not have kept [him] from getting out [of prison], more than one would have felt [his] knife." On another occasion, respondent discussed a confrontation with an employee of Grace House. Respondent relayed to the social worker that, as a result of a disagreement, he had told the employee that he planned to sexually assault the employee's wife, son and daughter. Respondent explained that he intended to make the employee afraid so that the employee understood that he could not "f*** with people's lives." Given the opportunity to reflect on those actions, respondent assured the social worker of his belief that his behavior had been justified and that, given another opportunity, he would make the same threats. More generally, the social worker explained that respondent's mental health had progressively deteriorated after he was released from prison, and that, during that time, he had increasing difficulty in dealing with the "mundane irritations of everyday life."

Brian Belfi, a licensed psychologist employed by the Office of Mental Health, testified that he interviewed respondent on two occasions – the most recent of which was approximately three months before the trial – and made other inquiries into respondent's background. Based on his interviews and review of relevant records, Belfi diagnosed respondent with, as is relevant here, ASPD with narcissistic and paranoid features. In explaining this diagnosis, Belfi placed the most emphasis on respondent's killing of his family and a stranger, noted respondent's multiple suicide attempts as a child and teenager, his repeated thefts from his parents, his truancy from school and his killing of cats. Belfi also considered respondent's history of physical altercations while in prison. Particularly in regard to respondent's narcissism, Belfi explained that respondent has initiated over 25 lawsuits in a short span of time, and that respondent was interested in having Belfi read his legal briefs due to respondent's belief that they were particularly well written. Further, and in regard to respondent's paranoia, Belfi

explained that respondent believed that Governor Andrew Cuomo had personally been involved with sending Belfi to do the examination.  Belfi further explained that respondent also believed that the Moreland Commission was somehow involved in his continued detention.  Further, Belfi relayed that respondent had a belief that he had negatively affected some business dealings of the CEO of Saving Grace Ministries and that, as a result, he was currently in danger from the mafia.

More generally, Belfi emphasized that it was important to him that respondent "dwell[ed]" on killing people in his recorded diary.  Belfi explained that he was not particularly convinced by respondent's explanation of the cathartic benefits of such recordings, given that respondent was a person who had killed multiple people.  Belfi testified that he believed that, over time, respondent would pose a moderate risk to others if he was allowed out into the community.  Based on this and other information obtained by Belfi, he opined that respondent had a mental illness that required care or treatment and that, if respondent were released to the community, he would be a danger to himself or others.

Respondent presented the testimony of Joe Scroppo, a psychologist and licensed attorney.  He diagnosed respondent with other specified personality disorder with paranoid, narcissistic and antisocial traits and major depressive disorder, recurrent, in full remission.  Based on this diagnosis and the information that he obtained, Scroppo opined that respondent had a low to moderate risk of dangerousness if released into the community. Scroppo believed that respondent's fights in school were within a normal range, that there was no indication that respondent had enjoyed killing cats, and that his behavior in the lead up to his parole revocation was his attempt to set boundaries and modify his environment.  Scroppo explained that respondent's use of his recorded diary to share his violent impulses was a good sign that respondent had acquired a tool to "drain off anger and other negative feelings."  According to Scroppo, while respondent's belief that the mafia was after him was probably an "exaggeration," he found it important that it was not a delusion. Scroppo further noted that respondent did not abuse drugs, which reduced his risk of dangerousness.

Supreme Court found Belfi's testimony more convincing and credible than Scroppo's testimony, and we discern no reason to depart from that determination. As such, Supreme Court properly found that respondent suffers from a mental illness within the meaning of CPL 330.20 (see Matter of Marvin P., 120 AD3d 160, 171 [2014]; Matter of Consilvio v Alan L., 7 AD3d 252, 255-256 [2004]). Turning to the question of dangerousness, respondent's killings as a teenager, though removed in time, offer some insight into the immense danger that respondent posed to the community at a point in time where respondent faced particular stresses and was not receiving mental health treatment. Although respondent has not engaged in particularly significant acts of physical violence since that time, that period has been most often marked by a highly structured detention environment and significant mental health interventions. During the one period of time that respondent began to be introduced back into the community, his mental health decompensated relatively swiftly. That decompensation was most notably marked by respondent's increased aggression, his expressed desire to commit violence and his threats of violence against others. Minimization of such threats as mere bluster is not warranted here, given respondent's history of the use of extreme physical violence against family, strangers and animals. Finally, as Belfi described, respondent lacks insight into his mental health condition and does not understand that he needs continued mental health treatment. Accordingly, we agree with Supreme Court that petitioner proved by a preponderance of the evidence that respondent suffers from a dangerous mental disorder requiring commitment in a secure facility (see Matter of Eric U., 40 AD3d at 1150; Matter of Consilvio v Alan L., 7 AD3d at 256-257).

Egan Jr., Rose, Devine and Clark, JJ., concur.

ORDERED that the order is affirmed, without costs.




                    ENTER:

                    Robert D. Mayberger
                    Clerk of the Court