Matter of James Q. (2021 NY Slip Op 01545)





Matter of James Q.


2021 NY Slip Op 01545


Decided on March 18, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: March 18, 2021

531989

[*1]In the Matter of James Q. Commissioner of the Office for People with Developmental Disabilities, Appellant- Respondent; James Q., Respondent- Appellant, and Suffolk County District Attorney, Appellant- Respondent.

Calendar Date: February 8, 2021

Before: Egan Jr., J.P., Clark, Aarons, Pritzker and Colangelo, JJ.


Letitia James, Attorney General, Albany (Kathleen M. Treasure of counsel), for Commissioner of the Office for People With Developmental Disabilities, appellant-respondent.
Timothy D. Sini, District Attorney, Riverhead (Guy Arcidiacono of counsel), for Suffolk County District Attorney, appellant-respondent.
Sheila Shea, Mental Hygiene Legal Service, Albany (Jeanne N. Smith of counsel), for respondent-appellant.



Clark, J.
Cross appeals, by permission, from three amended orders of the Supreme Court (Ellis, J.), entered August 17, 2020 in Franklin County, which, among other things, in a proceeding pursuant to CPL 330.20, found that respondent James Q. no longer suffers from a dangerous mental disorder and directed that he be transferred to a nonsecure facility for a period of commitment not to exceed two years.
In 2010, respondent James Q. (hereinafter respondent) entered a plea of not responsible by reason of mental disease or defect to the charges of rape in the third degree, criminal possession of a weapon in the third degree, criminal mischief in the third degree, menacing in the second degree, assault in the third degree, criminal mischief in the fourth degree and endangering the welfare of a child. Thereafter, in March 2011, respondent was found to suffer from a dangerous mental disorder (see CPL 330.20 [1] [c]) and committed to the custody of petitioner in a secure facility. Since then, several orders have been issued authorizing respondent's continued retention in a secure facility. In January 2020, petitioner commenced this CPL 330.20 proceeding seeking a subsequent retention order directing that respondent be confined in a secure facility for an additional two years. Following a hearing, Supreme Court concluded that respondent remained "mentally ill" within the meaning of CPL 330.20 (1) (d), but that he no longer had a dangerous mental disorder requiring confinement in a secure facility. Consequently, Supreme Court issued three orders: an amended subsequent retention order directing that respondent remain in petitioner's custody through October 2021, an amended transfer order directing respondent's transfer to a nonsecure facility and an amended order of conditions. By permission, petitioner and respondent Suffolk County District Attorney (hereinafter the DA) appeal from all three orders.[FN1]
To establish that a person suffers from a dangerous mental disorder requiring commitment in a secure facility, the petitioner bears the burden of demonstrating, by a fair preponderance of the evidence, that the person suffers from a "mental illness," as that term is statutorily defined (see Mental Hygiene Law § 1.03 [20]), and "that because of such condition he [or she] constitutes a physical danger to himself [or herself] or others" (CPL 330.20 [1] [c]). Here, the parties do not dispute that respondent suffers from a mental illness within the meaning of Mental Hygiene Law § 1.03 (20). Rather, the contested issue before us is whether respondent poses a physical danger to himself and/or others and therefore has a dangerous mental disorder requiring confinement in a secure facility (see CPL 330.20 [9]).
"[A] finding that a [respondent] currently constitutes a physical danger to himself [or herself] or others must be based on more than expert speculation that he or she poses a risk of relapse or reverting to violent behavior once medical treatment and supervision [*2]are discontinued" (Matter of George L., 85 NY2d 295, 307-308 [1995] [internal quotation marks omitted]). The necessary showing may be made "by presenting 'proof of a history of prior relapses into violent behavior, substance abuse or dangerous activities upon release or termination of psychiatric treatment, or upon evidence establishing that continued medication is necessary to control [the respondent's] violent tendencies and that [he or she] is likely not to comply with prescribed medication because of a prior history of such noncompliance or because of threats of future noncompliance'" (Matter of Amir F., 94 AD3d 1209, 1210 [2012], quoting Matter of George L., 85 NY2d at 308). "In reviewing a CPL 330.20 commitment determination, this Court's authority is as broad as that of the trial court and we may render any determination warranted by the record, though we defer to the trial court's factual and credibility findings" (Matter of Arto ZZ., 121 AD3d 1272, 1273 [2014] [citations omitted], lv denied 24 NY3d 1050 [2014]; see Matter of Amir F., 94 AD3d at 1212).
On the issue of dangerousness, petitioner relied on the examination report and expert testimony of a licensed clinical psychologist who interviewed respondent and reviewed various records, including respondent's treatment records and daily monitoring notes. Based upon her examination and review, petitioner's expert confirmed diagnoses made by respondent's treating psychiatrist, which include, among other things, bipolar disorder, attention deficit hyperactive disorder, mild intellectual disorder, narcissistic and antisocial traits and traumatic brain injury. She explained that, as a result of his diagnoses, respondent has impaired judgment and impulse control, has difficulty weighing the consequences of his actions and is quick to engage in conflict. More particularly, petitioner's expert stated that respondent's brain injury affects his "ability to tolerate routine frustration, to delay gratification, to make rational decisions, and to use good judg[]ment." Petitioner's expert asserted that respondent continues to require intense monitoring and redirection and opined that, without such monitoring and intervention, respondent poses a serious risk of substantial harm to himself and others.
With respect to the danger that respondent poses to himself, petitioner's expert noted that respondent suffers from dysphagia and temporomandibular joint dysfunction and has a history of choking, including an incident in which he had to be resuscitated. She noted that respondent continues to exhibit a pattern of resistance to staff directives regarding potential choking hazards, often acting in defiance to such directives. She also noted that, when reminded of potential choking hazards, respondent has engaged in escalating behavior that requires intervention from multiple staff members.
With respect to others, petitioner's expert opined that respondent poses a high risk of violence to females [*3]and that such risk cannot be adequately controlled in a nonsecure facility. She explained that respondent has demonstrated a tendency to react violently when rejected by a female or when he perceives such rejection. Significantly, respondent engaged in the underlying violent criminal behavior after being rejected by a female for whom he had romantic feelings. Petitioner's expert expressed concern about facility records demonstrating that respondent had recently fixated on a particular female peer and that he exhibited obsessive, grooming and stalking behavior in relation to that female. She noted that, as a result of "inappropriate perseverative, harassing, and sexual behaviors directed toward a vulnerable female peer" in December 2019, respondent had to be placed on additional enhanced support for several days. Petitioner's expert also highlighted two incidents, occurring in January 2020 and June 2020, when respondent reacted explosively to situations involving a female peer and went into extended periods of agitation, requiring multiple staff members to calm him. During the first incident, which arose when respondent was told that he would be kept physically apart from a particular female, respondent screamed and threatened staff members. The second incident stemmed from respondent's inability to reach the female peer by phone, after which respondent slammed a door, threw things and "got in" the face of a staff member, screaming "punch me." Petitioner's expert further noted respondent's documented refusal or inability to follow staff direction when it came to situations involving his female peers.
Petitioner's expert acknowledged that the number of assaults or attempted assaults in which respondent had been involved had decreased and she attributed that progress to "[m]edication, structure, monitoring, and [respondent's] own efforts." However, in the year prior to her examination and report, respondent had engaged in seven assaults or attempted assaults, made at least 35 threats and violated the facility's cell phone policy three times. Petitioner's expert further noted that, although respondent had made progress in managing his agitation and aggression when interacting with his male peers, he had not demonstrated the same progress with his female peers. She stated that, when respondent wants access to a female in whom he is romantically interested, he has been unable to apply "the gains he's made in following staff directions in other situations." Upon consideration of respondent's diagnoses and behavior, including his lack of impulse control, intolerance to rejection and volatility, petitioner's expert opined that, "[w]ithout the intense monitoring and redirection available only in an inpatient setting, [respondent] would present a serious risk of causing substantial harm to himself (through choking) and others (through physical and/or sexual violence)." In our view, the foregoing evidence satisfied petitioner's burden of establishing [*4]that respondent constitutes a physical danger to himself and/or others and that he continues to suffer from a dangerous mental disorder requiring confinement in a secure facility (see CPL 330.20 [1] [c]; Matter of Amir F., 94 AD3d at 1210-1212).
Supreme Court rejected petitioner's evidence and instead concluded that respondent no longer suffered from a dangerous mental disorder, implicitly crediting the opinion of respondent's expert. However, the court's factual findings were self-contradictory. Supreme Court credited petitioner's expert's diagnoses of respondent, finding, among other things, that respondent has bipolar disorder and a traumatic brain injury. These diagnoses, which cause impaired judgment and impulse control, contributed to the opinion of petitioner's expert that respondent constituted a present danger to himself and to his female peers. Without explanation, respondent's expert omitted the diagnoses of bipolar disorder and traumatic brain injury. In concluding that respondent no longer suffers from a dangerous mental disorder, Supreme Court relied upon an opinion that did not account for diagnoses that the court found respondent to have. Thus, the court never considered the impact that the diagnoses have on respondent's behavior and present dangerousness.
Most perplexingly, Supreme Court found that respondent did not constitute a physical danger to himself or others, despite also finding that respondent presented a "moderate" risk for violence, as was asserted by respondent's expert. The court and respondent's expert dismissed such "moderate" risk by reasoning that respondent's violence would be "likely of low harm and non-lethal." However, the physical danger that respondent poses to others cannot be obviated by speculation that the harm caused would likely be non-lethal or minimal. Moreover, Supreme Court and respondent's expert were dismissive of evidence demonstrating that respondent posed a higher risk of danger to females than to males. Indeed, they failed to even acknowledge, much less account for, respondent's tendency to engage in violence when faced with rejection or perceived rejection from females, as demonstrated by respondent's underlying criminal behavior and recent facility behavior.
Although we generally defer to the trial court's factual findings and credibility determinations (see Matter of John Z. [Commissioner of Health], 136 AD3d 1208, 1211 [2016], lv denied 28 NY3d 903 [2016]; Matter of Arto ZZ., 121 AD3d at 1273; Matter of Amir F., 94 AD3d at 1212), we cannot do so here given their inherent contradictions and flaws. Considering that this Court's authority is as broad as that of the trial court and that we may render any determination warranted by the record (see Matter of Arto ZZ., 121 AD3d at 1273; Matter of Marvin P., 120 AD3d 160, 169-170 [2014]; Matter of Amir F., 94 AD3d at 1212), we find, upon reviewing the evidence, that respondent continues to suffer from a dangerous mental disorder[*5], as that term is defined in CPL 330.20 (1) (c), and therefore requires confinement in a secure facility until at least October 2021 (see CPL 330.20 [9]). We thus modify the amended subsequent retention order accordingly and reverse the amended transfer order and amended order of conditions.
Egan Jr., J.P., Aarons, Pritzker and Colangelo, JJ., concur.
ORDERED that the amended subsequent retention order entered August 17, 2020 is modified, on the law, without costs, by reversing so much thereof as partially dismissed the petition and found that respondent James Q. does not continue to have a dangerous mental disorder under CPL 330.20 (1) (c); petition granted in its entirety; and, as so modified, affirmed.
ORDERED that the amended transfer order and amended order of conditions entered August 17, 2020 are reversed, on the law, without costs.



Footnotes

Footnote 1: Although respondent sought and obtained permission to cross appeal, he is no longer pursuing his cross appeal. This Court granted motions by petitioner and the DA for a stay pending appeal (see 2020 NY Slip Op 72861[U]).